THE ATCHISON, TOPEKA & SANTA FÉ RAILROAD COM-
PANY v. MARGARET ZEILER.

1. INJURY TO EMPLOYÉ—*Mistake of Surgeons—Liability of Company.* A
railroad company which procures competent surgeons to attend a
brakeman injured in its employ, and proceeds to transport him to a
hospital, in pursuance of the advice and direction of such surgeons,
and complies with all their directions as to his safety and care, is not
liable for any mistake, error in judgment or want of foresight in such
surgeons.

2. FACTS *Stated—Company, not Liable.* The plaintiff's intestate had his
leg crushed at Woodward, in the Indian Territory. By direction of a
surgeon, he was transported into Kansas. This action is brought to
recover for improper treatment afterward received by him, no claim
being made on account of the original injury. The jury, in answer
to a special question, find that he died from the injury received in
the Indian Territory, and consequent loss of blood. All that was
done by the railroad company and its employés was under and in ac-
cordance with the direction and advice of competent surgeons, in
whose selection there is no claim of want of care. *Held,* That the
company is not liable for the death of the injured man.

*Error from Barber District Court.*

THE amended petition in this case shows, in substance,
that the plaintiff is the widow of Jeremiah H. Zeiler, de-
ceased, who was employed as a brakeman by the Atchison,
Topeka & Santa Fé Railroad Company ; that on the 7th day
of April, 1889, he was injured at Woodward, in the Indian
Territory, by having his right leg and foot run over and
crushed; that the defendant, in connection with its railroad,
maintained a hospital system, and had in its employ physi-
cians and surgeons located in the cities along the line of its
railroad; that in order to maintain such hospital system and
corps of physicians and surgeons, the company made monthly
assessments on its employés, and deducted such assessments
from their wages, and in consideration thereof, it undertook
and agreed that in case of sickness or injury of any of its
employés while in the performance of their duties, it would
promptly furnish them with skillful medical and surgical

treatment and care; that after such injury was so received by said Zeiler, the defendant negligently and wantonly carried him on a freight train through the cities of Kiowa, Hazelton, and Attica, within 20 miles of his home at Medicine Lodge, through Harper, Argonia, and Danville, to Wellington, without procuring or rendering any medical or surgical treatment to said injury; that at Wellington, it caused said Zeiler, who was then in a helpless condition, to be transferred to another train and carried through the city of Belle Plaine, to Mulvane, without rendering any medical care or treatment; that on account of the negligent and wanton use and treatment of said Zeiler by the defendant, its agents, servants, and employés, he became greatly weakened from the loss of blood, from which cause, on the 10th day of April, 1889, he died. The petition concludes with a prayer for judgment for $10,-000 damages. Afterward a supplemental petition was filed, alleging the birth of a child of plaintiff and her deceased husband after the commencement of the action. On the trial, the plaintiff offered in evidence a copy of the charter of the Santa Fé Railway Employés' Association, a benevolent and charitable corporation, formed for the purpose of providing medical and surgical treatment and care for the employés of the Atchison, Topeka & Santa Fé Railroad Company, its leased and auxiliary lines, who may be injured or disabled by accident or sickness while in the line of duty. A copy of the by-laws, rules, and regulations, and a list of the officers, chief and local surgeons, were also put in evidence by the plaintiff. The jury brought in a general verdict in favor of the plaintiff for $6,500, and returned the following special findings:

"1. Do you find that deceased was injured at Woodward, I. T., on the 7th day of April, 1889, and died of such injuries afterward? Ans. Yes; and from consequent loss of blood.

"2. What injuries do you find deceased to have sustained at Woodward, if any? A. Loss of left leg above ankle.

"3. Were such injuries of a slight or serious nature? A. Of a serious nature.

"4. Is it not a fact that the injuries received by deceased

at Woodward, on April 7, 1889, were only slight ?   A.  No.

" 5.  What effect did the contusion or wound upon the back of deceased have upon him, if any ?   A.  No appreciable effect.

" 6.  What effect did the crushing of the limb of deceased have upon him.   A.  It caused him to become helpless.

"7.  How did injury occur?   A.  By having his left leg run over with a car wheel or wheels, while in the performance of his duty as brakeman.

" 8.  Where was deceased taken after his injury ?   A.  Into the station house.

" 9.  Who suggested the taking of deceased to hospital?  A.  The officials of the railroad company ; we do not remember the names.

" 10.  Did deceased agree to be taken to hospital?   A.  Only when he learned that he would not be taken home.

"11.  Did the conductor of the train upon which the deceased was braking hold the train and make the arrangements for taking deceased to hospital?   A.  Yes.

" 11½.  At the time the train left Woodward, what was the destination of deceased?   A.  Ottawa.

" 12.  Do you find from the evidence that there was any place down in the Territory where the deceased could have been properly cared for, near where he was injured?   A.  Yes.

" 13.  Did the conductor, Dillard, use diligence in the moving of the deceased from place of injury?   A.  Yes, in so far that he complied with the orders of his superiors.

" 14.  If the last above question is answered in the negative, the jury will then state in what lack of diligence consisted.   A. ———

" 15.  Who besides Conductor Dillard recommended the removal of deceased to hospital?   A.  Doctor Hart, and the railroad officials; we do not remember the names.

" 16.  Did deceased die at Mulvane, Kas., April 10, 1889, from the effects of his injuries?   A.  Yes, and in consequence of loss of blood while *en route* from Wellington to Mulvane, Kas.

" 17.  Do the jury think from the evidence that the simple smashing up of and mangling of deceased's leg and the cutting off of his leg afterward was sufficient to kill deceased?  A.  Not necessarily.

" 18.  Is it a fact that the mashing of the leg, the cutting off of same, and the contusion or wound in the back were sufficient to kill deceased ?   A.—

"19. Would deceased have died if he had been left at Woodward with the care that could have been given him there? A. We think not.

"20. Is it not a fact that about 34 per centum of persons injured in the leg, and leg is immediately amputated below the knee, die from the effects thus produced? A. According to accredited authority it is.

"21. What persons in the employ of the defendant do the jury find were negligent toward deceased, if any? A. The physicians and officials of the railroad company; we do not remember the names.

"22. In what were such persons negligent? State fully. A. In that he was not at once removed to his home, in Medicine Lodge; in that he had not competent medical attendance while *en route* from Wellington to Mulvane, Kas.

"23. In what branch of defendant's business do you find such persons, if any, who were negligent to deceased, were employed at the time? A. In the superintendent's and also in the medical department, and the officials of the railroad company.

"24. If the jury find for the plaintiff in this case, they will then state fully for whose negligence they find defendant liable. A. The officials of the railroad company; we do not remember the names.

"25. If the jury find for the plaintiff in this case, they will then state fully how they arrive at the damages found? A. ―――."

The defendant moved for judgment on the special findings, notwithstanding the general verdict. This motion was overruled, and judgment entered on the verdict in favor of the plaintiff. The railroad company brings the case here.

*A. A. Hurd* and *Robert Dunlap*, for plaintiff in error:

1. The defendant cannot be held liable, because it did not owe to the deceased the duty or obligation to furnish surgical aid, or to take care of him after his injury. It is not pretended or claimed that the railroad company was liable to Zeiler on account of the injuries which he received while in its employ, and if there existed no legal liability for the injuries so suffered, there certainly did not exist any obligation on the part of the railroad company to furnish to him med-

ical aid or to take care of him. This would seem to be self-evident, for no case can be found in which an employé has been permitted to sue the employer and recover damages because the employer either failed to furnish medical aid or to pay for the same. It is only where the employer is liable in damages for the injury that the employé can recover, as part of his damages, sums. necessarily expended for medical aid and attendance, because these necessarily follow from the wrong done to him; but if the employer is guilty of no wrong in causing the injury from which a legal liability would flow, there would exist upon the part of the employer no greater obligation to furnish medical aid than there would exist upon the part of the mere stranger. See Wood, Mas. & S., § 99.

But it was not charged, nor was it proven, that there was any negligence in respect to the employment of reasonably competent physicians and surgeons. These physicians and surgeons had to be selected along the route, and there would be no negligence in employing a practicing physician, unless he were known to be incompetent. If, therefore, there was any such undertaking on the part of the railroad company, it could not be held liable merely because some physician or surgeon should be negligent in the performance of his duty, but the plaintiff would have to go further and show that the company was negligent in the selection of a physician or surgeon, and this was not shown. So far as the physicians or surgeons in Kansas were concerned, they were required by the laws of this state to pass an examination and receive a certificate, and when they did so, certainly one would not be negligent in employing any such physician or surgeon.

See *S. F. Rld. Co. v. Price*, 13 S. Rep. 638; *U. P. Rly. Co. v. Artist*, 60 Fed. Rep. 365–368; *O'Brien v. Steamship Co.*, 154 Mass. 272; *Laubheim v. DeK. N. S. Co.*, 107 N. Y. 228; *McDonald v. Mass. General Hospital*, 120 Mass. 432; *Secord v. St. P. M. & M. Rld. Co.*, 18 Fed. Rep. 221; *Davis v. Old Colony Rld. Co.*, 131 Mass. 258; *Oregon Rly. & Nav. Co. v. Oregon Rly. Co.*, 130 U. S. 1.

2. The court erred in submitting the case to the jury upon a wrong theory and in an improper instruction.

We simply call attention to the third instruction given by the court, which is clearly erroneous.

3. The court erred in overruling the motion to suppress the deposition of Thomas Silvers. The service of the notice to take the same upon a station agent was illegal, and no deposition could be taken under such notice. The illegality of the service was not waived because the defendant did not appear. See *A. T. & S. F. Rld. Co. v. Sage*, 49 Kas. 524.

*S. L. Overstreet*, and *W. S. Denton*, for defendant in error:

1. When Zeiler was transferred to the baggage car at Wellington, Kas., in a helpless condition, by the company, to be conveyed to the hospital at Ottawa, it was its duty to exercise reasonable care and diligence for his safety and comfort, as was said in the case of *A. T. & S. F. Rld. Co. v. Weber*, 33 Kas. 554. See, also, *L. & N. Rly. Co. v. Stacker*, 86 Tenn. 346; same case, 6 Am. Rep. 840, and notes; *O. & M. Rly. Co. v. Muhling*, 30 Ill. 9; same case, 81 Am. Dec. 336, and notes.

After trying the case upon a theory as to what the law is, and having procured the giving of instructions defining the law applicable to the case, certainly the defendant cannot now be heard to say that those instructions were erroneous. The supreme court will not reverse a case because the court below gave erroneous instructions at the request of the complaining party. *K. P. Rly. Co. v. Cutter*, 19 Kas. 83; *Greer v. Higgins*, 20 id. 424; *Irwin v. Thompson*, 27 id. 645. See, also, *City of Wyandotte v. Noble*, 8 Kas. 444.

2. It is contended on the part of the defendant that the court erred in submitting the case to the jury upon a wrong theory and in an improper instruction, the third.

All instructions must be considered together, as a whole. *Gillett v. Corum*, 7 Kas. 156.

3. If it was error for the court to overrule the motion of defendant to suppress the deposition of Thomas Silvers, it was

a harmless error, because the witness Silvers only testified that he was present at Woodward, in the Indian Territory, when the injury occurred, and did not testify to a single statement material to the issues in the case. See *K. P. Rly. Co. v. Little*, 19 Kas. 267; *Germond v. Littleton*, 22 id. 730; *Comm'rs of Brown Co. v. Roberts*, 22 id. 762.

The opinion of the court was delivered by

ALLEN, J.: In this case we are called upon to decide whether, under the pleadings, the special findings of the jury, and the conceded facts of the case, there can be a recovery against the railway company. Jeremiah H. Zeiler, while attempting to uncouple freight cars at Woodward, I. T., fell, and the wheels of the car ran over his ankle, crushed it, and almost severed the foot. Woodward was· a station with a kind of eating house, but no physician or drug store, and no good accommodations for taking care of a person in Zeiler's condition. The accident happened at a little after 8 o'clock in the evening. The train hands took Zeiler from the place where he was hurt to the depot, and placed him on a cot. They tied a handkerchief around his leg to prevent its bleeding, gave him stimulants, and supplied him with blankets to make him as comfortable as possible. The accident was reported to Mr. Strong, the train master at Wellington. The conductor received no response to his notice. A telegram informed him that a doctor would be sent there from Canadian, Tex., on a freight train that would arrive about 11 o'clock. About that time the freight train arrived, with Dr. J. A. Hart, a physician and surgeon, who then resided at Canadian, Tex. He gave Zeiler whisky and hypodermic injections of morphine, and wrapped the leg at the seat of the injury with absorbent lint, and placed a bandage around it below the knee. Zeiler was then taken on the cot into the caboose of the freight train, and at 12:14 A. M. the doctor started with him for· Wellington. Doctor Hart testifies that this was so done by order of Chief Surgeon Hogeboom, and that he did not amputatate at

that time for the reasons that he deemed it best to give the nervous system time to rally from the shock; that the situation was such that no intelligent assistance could be easily procured, and the surroundings were not such as would have permitted Zeiler to be properly cared for after the amputation was performed, and that his orders from the chief surgeon were to send him to the hospital at Ottawa. The freight train made rapid time to Wellington, arriving there at 7:10 the next morning. During the whole of this journey, he was accompanied by Doctor Hart, and the evidence shows that up to the time of his arrival at Wellington there had been very little bleeding from the wounded limb. At Wellington, Dr. J. M. Hunt, who testifies that he was the local surgeon employed by the Atchison, Topeka & Santa Fé Railroad Company, met Zeiler on his arrival. He advised sending him to the hospital at Ottawa, and testifies that as he had come so far, and was in no condition to be operated upon, he filled out a blank for his admission to the hospital. He was then transferred on the same cot to the baggage car of the passenger train. After the train left Wellington, the wound commenced bleeding freely, and on the arrival of the train at Mulvane he was removed from the car, taken to a hotel, and placed under the care of Dr. H. T. Shelley. From Wellington to Mulvane, the deceased appears to have been in charge of a young man, who had some pills he was giving him, which he said were morphine, which the doctor had ordered to be administered in case he was suffering much pain. After his removal to the hotel, as soon as the necessary preparations could be made, the injured limb was amputated below the knee by Doctor Shelley, with the assistance of another physician. Zeiler died on April 10. Doctor Shelley testifies that he was a physician and surgeon employed by the railroad company; that Zeiler was removed from the car by his direction, so that the limb could be amputated; that he took charge of Zeiler by direction of Mr. Garland, the train master.

While it is contended by the railroad company, and there is evidence showing, that the various physicians who attended

upon the deceased were employed by the Santa Fé Railway Employés' Association, there is some evidence showing that they were employed by the railroad company, and for the purposes of this case, in support of the general verdict, it must be assumed that they were so employed. There is no claim that the injury was the result of any negligence on the part of the railroad company, or of anyone except Zeiler himself. Nor was there anything to indicate that the original injury was in any manner aggravated, or rendered more serious, prior to his arrival at Wellington, except, perhaps, from fatigue necessarily incident to the trip. It is contended, however, that Zeiler, who resided with his wife at Medicine Lodge, expressed a desire to be taken home, and it is urged that he should have been taken home, or that amputation should have been made earlier than it was in fact. It is contended that there were various places on the line of the road intermediate between Woodward and Mulvane where the operation could have been successfully performed, and that the railroad company was negligent in undertaking to transport him so far, with his leg in its mangled condition, and that it was especially negligent in that part of the trip from Wellington to Mulvane, on which it appears that he was not attended by a physician, and that he did bleed profusely. As to the claim that it was the duty of the railroad company to take Zeiler to his home at Medicine Lodge, it is not shown by the evidence that he could have been taken there as quickly, or with as little inconvenience, as he was in fact taken to Mulvane. It is shown that the course that was adopted was in accordance with the advice and direction of the surgeons who were called to attend the injured man. It also appears that the deceased consented to being taken to the hospital at Ottawa, if the doctors thought it best.

In the case of *Railroad Co. v. Weber*, 33 Kas. 543, it was held to be the duty of a railroad company to exercise reasonable and ordinary care in temporarily providing for the protection and comfort of a sick, unconscious and unattended passenger. It may be conceded that it was the duty of the

railroad company to so provide in this instance. The sub-
stantial question is as to the measure of that duty, and the
extent of the railroad company's liability for any improper
treatment the deceased may have received. That a railroad
company, in the transportation of persons and property, is
held to the use of skill as well as care and diligence, is well
settled. By recent legislation, railroad companies have also
been held liable for injuries received by persons in their em-
ployment resulting from the negligence of co-employés. Such
companies are chartered for the purpose of transporting per-
sons and property by the use of the power of steam. In
fulfilling their duties to the public, they are required to be
skilled in the business in which they are engaged. Each offi-
cer and employé must be selected with reference to his quali-
fications and fitness for the discharge of the particular duty
imposed on him. The care of persons suffering from wounds,
bruises, or illness, is a matter altogether distinct from the
transportation of persons and property. To provide for the
needs of such, we have the learned profession of physicians
and surgeons. The law requires that those who assume to
practice medicine and surgery shall possess certain qualifica-
tions of skill; shall have received education and training,
fitting them for their calling. Can a railroad company, then,
be held liable for the mistakes of physicians whom it may
call to care for its passengers? In the treatment of an in-
jured brakeman, should the managers of the railroad comply
with the directions of the surgeons who are called to attend
him, or should they assume superior knowledge, with refer-
ence to his proper treatment, and act in accordance with their
own judgment?

In this case, it cannot be said that there was a lack of med-
ical counsel, nor that the company was dilatory in obtaining
the attendance of surgeons. Doctor Hart came up from Ca-
nadian, Tex., and was with the injured man within about three
hours after he was hurt. It does not appear that it would
have been practicable to bring a surgeon there in less time.
There is nothing in the the record showing that Doctor Hart

was not a surgeon of good repute.  It does affirmatively appear, and it is uncontradicted, that Doctor Hart advised the removal of the injured man; that he personally attended him from Woodward to Wellington.  There is no complaint of a want of proper care on the trip to Wellington.  It appears that at Wellington the patient was visited by Doctor Hunt, who, also, was a reputable surgeon.  The transfer from the freight to the passenger train was made under his advice and by his direction.  Zeiler was started on his journey by Doctor Hunt.  It was his duty to have examined the wound, and the condition of the patient, to have determined whether he was in a condition to endure the journey to Ottawa, or whether it would be better to remove him from the cars and amputate the limb at once.  If it were determined that the journey should be made, it was his duty to see that the wound was properly dressed; that the patient was provided with those things that were necessary for his safety and comfort.  The employés of the company whose primary duty was to operate the train could not be expected to exercise surgical skill, or to do more than carry out any directions the surgeons might give for his safety and comfort.  If there was excessive bleeding which might have been prevented during the hour's ride from Wellington to Mulvane, was it the fault of the railroad company?  It clearly was not the fault of the train hands, for they cannot be held to the exercise of any degree of medical or surgical skill.  How can it be said to be the fault of the train master, or of any superior officer of the railroad company?  They had called competent physicians, and were taking the injured man to the hospital in accordance with their advice.  The law is well set-

1. Injury to employé—mistake of surgeon—liability of company.

tled that a railroad company having used reasonable care in his selection is not chargeable with the want of skill in a physician or surgeon whom it calls for a passenger or injured employé, and this is so even where the law requires a steamship company transporting immigrant passengers to carry a physician.  (*O'Brien v. Steamship Co.*, 154 Mass. 272; *Laubheim v. Steamship Co.*,

107 N. Y. 228; *Secord v. Railway Co.*, 18 Fed. Rep. 221;
*U. P. Rly. Co. v. Artist*, 60 id. 365.)

This case was tried on the theory that no recovery could
be had for anything that occurred in the Indian Territory.
The court so instructed the jury. There was neither evi-
dence nor claim of culpable negligence causing the injury in
the first place. The answer of the jury to the first special
question, standing alone and by itself, would therefore bar
the plaintiff's recovery. The question and answer are as fol-
lows: "Q. Do you find that deceased was injured at Wood-
ward, I. T., on the 7th day of April, 1889, and died of such
injuries afterward? A. Yes, and from consequent loss of
blood." If there was no liability for the injury, there could
be none for the consequent loss of blood. If the deceased
came to his death from this cause, the want of attention and
care at the hands of the railroad company and the surgeons
could not furnish grounds for an action in favor of his widow
and child, for the injury and consequent loss of blood are
found to be the cause of his death. The jury find that, ac-
cording to accredited authority, about 34 per cent. of persons
injured in the leg, which is immediately amputated below the
knee, die from the effects thus produced, but they express
the opinion that the deceased would not have died if he
had been left at Woodward, with the care that could have
been given him there. It is clearly a matter of speculation
and opinion as to whether the deceased would have died
under any different course of treatment now suggested by
the plaintiff in this case. All the testimony shows that
the result of such injuries cannot be foretold with certainty.
It is the province of surgeons to apply their skill and care for
the relief of a person in such condition. Even they can never
be held as insurers of the lives of their patients. They can
only be held to the exercise of proper skill, care, and dili-
gence. When the railroad company caused the attendance of
reputable surgeons, and complied with all their directions
and recommendations, with Zeiler's consent, it had discharged
its duty. No claim is made in this case, nor was there any

evidence, that either one of the surgeons who attended Zeiler was other than a reputable member of his profession. As all the acts of the company after the arrival of Doctor Hart at Woodward were done with the advice and under the direction of the surgeons in charge, there is nothing in this record to uphold the verdict against the railroad company, but we are forced to hold that the special findings of fact by the jury, as explained by the testimony in the case, show that there was no liability on the part of the railroad company. It is therefore ordered that the judgment be reversed, and that judgment be entered on the special findings in favor of the defendant.

2. Facts, stated— company, not liable.

All the Justices concurring.