· JOHN HAGGERTY, Respondent, v. ST. LOUIS, KEOKUK & NORTHWESTERN RAILROAD COMPANY, Appellant.

St. Louis Court of Appeals, April 14, 1903.

1. **Malpractice:** PHYSICIANS: NEGLIGENCE: PETITION, HELD SUFFICIENT. In an action by a member of the railroad employees' relief department for malpractice of physicians, furnished by defendant, to treat plaintiff for an injury, the petition stated that defendant obligated itself to furnish competent and skilled physicians to attend injured employees, who were members of the relief department, and that in disregard of such obligation it furnished unskilled surgeons, who treated plaintiff in a negligent manner, to his detriment; and that plaintiff submitted to treatment by such physicians on account of the contract between him and defendant for surgical attendance by virtue of his membership in the relief department: *Held*, that the petition was good, and was not objectionable on the ground that such allegations were mere conclusions of law, but were a statement of the ultimate facts of the case.

2. ———: ———: ———: RELIEF DEPARTMENT: "CLERICAL ERROR" IN PETITION, CORRECTED. Where plaintiff sued a railroad company for injuries sustained by negligence of physicians furnished by the railroad's relief department in treating him for an injury, the word "proper," in an allegation of the petition, that in consequence of such negligence, in furnishing plaintiff "proper medical and surgical treatment and physicians and surgeons," and on account of their carelessness and inefficiency, plaintiff's leg,

which had been broken, was crooked and weak, and nearly useless, etc., was a clerical error, and should be read "improper."

3. ———: ———: ———: PETITION CURED BY VERDICT: WHEN. Failure of the petition to allege a fact without which the jury could not have rendered their verdict, is cured by the verdict, if the existence of such fact can be gathered by reasonable intendment from facts definitely averred.

4. ———: ———: RELIEF DEPARTMENT: B. & S. WERE ATTENDING PHYSICIANS. Plaintiff, who was a member of a railroad relief department, on sustaining a fracture of the leg, was given temporary treatment by S., pending the arrival of defendant's physician, B. On arrival, B. examined the fracture, approved the treatment of S., and instructed the latter to continue treating plaintiff and send his bill to defendant. In an action against defendant for the negligent treatment of plaintiff's injury, the petition charged that plaintiff was treated by both B. and S., and that his condition resulted from the negligence of both. B. testified that he visited plaintiff on numerous occasions, and admitted that, on plaintiff's expressing dissatisfaction with the setting of his limb and desiring it reset, he advised against such operation, but stated that his visits to plaintiff and consultations with S. were merely as medical examiner of defendant's relief department, and to ascertain how long plaintiff was entitled to benefits, and when he was able to resume work: *Held*, that such facts warranted the finding that both B. and S. were attending physicians in the treatment of plaintiff.

5. ———: ———: CHARITABLE CORPORATIONS: NOT LIABLE FOR TORTS OF AGENTS, WHEN. Eleemosynary corporations are not generally liable for the torts of their agents for the reason that such institutions are the beneficiaries of trust funds.

6. ———: ———: RAILROAD, SUIT AGAINST: NEGLIGENCE OF PHYSICIANS: AUTHORITY FOR EMPLOYMENT FOR JURY. In an action against a railroad for the negligence of physicians furnished by its relief department, the answer alleged that the relief department had the option to furnish members surgical attention, when injured, or refrain from doing so. The department's examining physician testified that, while it was customary to pay bills for medical treatment of members, such payment was made only when members were disabled by accident, and that if the physician was satisfied that the member was receiving unskillful treatment the fact would be reported to the department, which could advise but could not change the physician against the patient's will. Medical examiners were authorized to certify bills for surgical treatment, and such examiner employed S. to treat plaintiff, whose bill for services was certified and paid by defendant: *Held*, that whether such examining physician had the authority to employ S. to treat plaintiff, was for the jury.

7. ———: ———: VOLUNTARY RELIEF DEPARTMENT: NOT A CHARITABLE INSTITUTION. A railroad's relief department, supported by sums of money deducted from the wages of employees, who become sick or injured while in the company's service, but the benefits of which such employees are not entitled to receive except on condition of relieving the company from liability for negligence in causing the injury, is not a charity so as to relieve the department from negligence in selecting a physician to treat an injured employee, who was a member of such department.

8. ———: ———: ———: CHARITY, DEFINITION OF. A charity, in a legal sense, may be more fully defined as a gift to be applied consistently with existing laws for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government.

9. ———: ———: ———: RESPONDEAT SUPERIOR, NOT APPLICABLE. Where a railroad's relief department was authorized to furnish surgical attention to an injured employee, entitled to the benefits of such department, but was not bound to do so, the company was not liable, under the doctrine of *respondeat superior*, for the malpractice or negligence of a surgeon so furnished, but was only bound for the exercise of reasonable care in selecting a surgeon of average skill.

10. ———: ———: NEGLIGENCE IN SELECTING SURGEON. The actionable negligence in a case like this, is want of care in the selection of the surgeon, and if the injury received by the servant was not caused by such negligence, the servant injured by malpractice has no recourse against his employer.

Appeal from Lewis Circuit Court.—*Hon. E. R. McKee,*
Judge.

REVERSED AND REMANDED.

STATEMENT.

In 1898, and prior thereto, plaintiff was in the employ of the defendant railroad company as section foreman, and on March 10th of that year, while in the discharge of his duty, his right leg was broken a few inches above the ankle joint. He was taken to his home in the city of Canton, in Lewis county, the accidnet having oc-

curred a short distance away, and Dr. Ben H. Smith called to see him in response to the request of Jesse Downs, one of the section gang. Plaintiff did not send for Dr. Smith, and, according to his testimony, never knew why the doctor called on him.

. Accepting as true the testimony in behalf of the plaintiff, that physician set his leg, inclosed it in splints and bandages and remarked that the treatment administered "would do until the railroad physician came." Smith called and cared for the patient a time or two before the railroad physician arrived, who reached Canton the night of the day following the accident. This railroad doctor was J. J. Bourne, who resided in Hannibal, and was one of the medical examiners of the Burlington Voluntary Relief Department, an organization which will be described later.

When Dr. Bourne first called on Haggerty, Doctor Smith was not present, but Bourne had him telephoned for and when he came he took the dressing from Haggerty's limb at Bourne's request, the latter examined it and said the treatment was all right.

The facts in regard to Dr. Bourne's connection with the case, as well as the employment of Dr. Smith, were strongly disputed and the evidence on those issues is very contradictory. We shall state it in accordance with the testimony of the witnesses for the plaintiff, as we are bound to do in considering the contention of the defendant that there was no evidence that Bourne treated the case at all or that he employed Smith to treat it.

As stated above, the testimony is that Smith gave the wound first attention and said it would do until the physician of the company arrived. Bourne and Haggerty both testified that the former examined the leg at Haggerty's request; but Haggerty says that Bourne approved the treatment and then turned the case over to Smith.

On this point Florence Wright, who was present

when Dr. Bourne first called, testified the latter said he could save the limb and told Haggerty he ought to be out in three or four weeks; further, that when Dr. Smith first dressed the leg he said to Haggerty that he thought he (Haggerty) "would rest very well until morning, until the railroad doctor came," and that if he did not come that he (Smith) would come down and do something for Haggerty until the railroad doctor got there. She also testified to being present when the railroad doctor fixed the leg, and that Haggerty did some awful struggling; further, that she heard Smith say, during either his first or second visit, that the case would have to be given to the railroad doctor.

Dr. Smith made out his bill against the relief department and the department paid it. He did this by direction of Dr. Bourne, and both physicians testified that Bourne told Smith on his first visit to treat the case and the department would pay him. Smith continued to visit Haggerty until about the first of August when the latter resumed work for the railroad company, he swears, by the advice of both doctors and by the command of Lariston, an officer of the railroad company, but just what officer we are unable to discover from the evidence.

Haggerty testified that Dr. Bourne told him in June, and also in July, he was well enough to go to work; that he complained of his leg being weak, and Dr. Bourne told him it was muscular contraction and that the limb needed exercise. The effect of Haggerty's testimony is that by the advice of the two doctors and the order of the company, he went to work reluctantly, feeling that he was not yet well enough. The doctors, on the other hand, testify that they warned him against resuming work so soon and told him his leg was still too weak. He continued in the service of the company until August 21st, when, on account of the condition of his leg, he quit. It is the contention of the defendant that he injured it afresh during the interval he worked.

He was treated again for a long time and was practically out of service until June, 1899, disabled from work most of the time by the condition of his leg.

This action was brought to recover damages for alleged maltreatment and unskillful and negligent surgery by the physicians, it being stated that in consequence of their negligence in setting the bones the leg was crooked and shorter than the other one, and that plaintiff was permanently crippled.

Without going into details, it is sufficient to say there was evidence tending to prove the bones were not properly set nor efficient and skillful surgery displayed in taking care of the fracture until it healed; that the dressing and splints were taken off too frequently and from that cause the bones knit together at an obtuse angle and not in exact juxtaposition, the result being that the leg is out of line between the knee and the ankle. On the contrary, there was much evidence that the surgery was skillful and first-class; that the injury was slow in healing on account of the condition of the patient's health, he being of a scrofulous constitution, and that he went to work too early against the remonstrance of the doctors, and injured his leg at the fracture again.

The petition charges that the defendant and several other railroad companies of allied interests had a Voluntary Relief Department, among the companies being the Chicago, Burlington & Quincy Railroad Company; that on account of their interests being allied said companies, prior to March 15, 1899, united their relief departments under the name of the Burlington Voluntary Relief Department. An agreement was made that each of the several railroad companies should appoint the same officers and manager to control their relief departments and that one joint advisory committee should represent all said corporations in the management. The petition further states that the relief fund used by the united departments was made up of sums

deducted from the wages of the employees of the companies in proportion to their earnings, which fund was to be used to pay the members' benefits when they were disabled by sickness or accident and to pay benefits to their families in case of their death; that when the plaintiff became section foreman for the defendant company he was requested to become a member of the relief department and did so, and thereafter the sum of $1.50 a month was deducted from his salary as his contribution to the relief fund. The petition further states that the defendant, through the said relief department, obligated and bound itself, not only to pay its employees who were members of said department benefits in case of disability, *but also to furnish competent and skillful physicians and surgeons to attend, administer and operate on members who were injured or crippled by accident or otherwise in service;* that after his leg was broken, plaintiff, at the solicitation of defendant, placed himself at defendant's disposal and the latter, in disregard of its obligation, put plaintiff in care of surgeons B. H. Smith and J. J. Bourne, who treated him unskillfully and negligently; that plaintiff relied on defendant to furnish him careful and reliable surgeons, believed defendant had done so and submitted to the treatment of the physicians furnished by defendant, who negligently set and treated his leg, causing the permanent injury stated. The petition also charges that while the plaintiff's leg was unhealed, and while he was unable to perform manual labor, said physicians reported he was able and ready for duty, in consequence of which plaintiff was notified by defendant to resume work and obeyed the order, whereby he suffered continual and severe pain, endangering his health and life. There are also averments that on account of the careless and improper treatment of the plaintiff by defendant's physicians, and on account of the failure of the defendant to furnish proper surgical service and treatment, and the total disregard of the defendant's

duty in the premises, plaintiff has been rendered unfit for manual labor and the performance of his usual vocation in life. We also find this averment in the petition: "That in consequence of said negligence on the part of said defendant in furnishing plaintiff with *proper* medical and surgical treatment and physicians and surgeons, and on account of their carelessness and inefficiency, plaintiff's leg, broken as aforesaid, is crooked, weak and almost useless and he is crippled and disabled for life." The word "proper" in the above averment is evidently a clerical error, as the whole scope of the petition shows that "improper" was the word intended.

The answer denies most of the allegations of the petition, but admits the organization of the Burlington Voluntary Relief Department, says it was not organized in the manner and for the purpose stated in the petition, the petition stating that it was organized by the defendant for gain and to further its own interests; denies that the railroad company derived any pecuniary benefit from said department; admits that through said department defendant obligated itself to pay its employees who made monthly contributions to the relief fund, certain benefits in case of disability by accident or otherwise, but denies that defendant obligated itself to furnish competent and skillful physicians and surgeons or any physician or surgeon to attend on members who were injured. There is this allegation:

"Defendant says that said relief department, in its discretion, could either furnish to members in need thereof necessary surgical attendance, or pay for necessary surgical attendance on members of said department, the bill thereof to be made out by the surgeon who attended the employee at his request, against said employee, which said bills, before being paid, must be approved by the medical director of said relief department; defendant says that said relief department has never made any provision for necessary surgical at-

tendance on any member, but has always allowed injured members to select their own surgeons, whose bills for services when approved by the medical director of said relief department, were paid by said relief department, all of which was well known to plaintiff."

The answer denies that the defendant placed Dr. Smith or Dr. Bourne in charge of plaintiff's case or employed any surgeon to operate on him, denies that any negligent or careless treatment was given to the plaintiff, avers that plaintiff himself employed Dr. Smith, but that defendant, through the relief department, paid his bill. The answer then proceeds to make allegations in regard to payment of liabilities by the defendant company on account of said relief department and the expense to the railroad company in conducting it, the effect of which is that much more is paid by the defendant than is contributed by the members, so that the department is really a burden on the defendant.

A replication was filed putting in issue the new matter pleaded in the answer and containing other averments not necessary to state.

The Burlington Voluntary Relief Department was a combination of similar associations, appurtenant to six or seven railroads having a community of interests and its purpose was to provide, as heretofore stated, for disability and death benefits to its members. According to the regulations of the association, no railroad employees were bound to become members of the relief department. All those regulations are contained in the transcript; they are quite voluminous and only such as bear directly on the questions in this case will be recited or mentioned. The relief department is a branch of the regular business of the railroad companies and practically under their control, as the following regulation show:

"The relief department is a department of the company's service, in the executive charge of a superintendent whose directions in carrying out its regula-

tions are to be complied with, subject to the control of the president.''

As the department has no president, the word ''president'' used in that section must refer to the president of the railroad company itself.

Another section provides as follows:

''4. The company shall have general charge of the department, guarantee the fulfillment of its obligations, take charge of all moneys belonging to the fund and be responsible for their safe-keeping, pay into the fund interest at the rate of four per cent per annum on monthly balances in its hands, supply the necessary facilities for conducting the business of the department, and pay all the operating expenses thereof.''

There is an advisory committee, one half of which is chosen by the boards of directors of the railroad companies, and the other half by the members of the relief fund; but the control of this advisory committee rests with the railroad companies, for it is provided that the general manager of the railroad company (it seems of the Burlington Railroad Company) shall be ex-officio a member of the advisory committee, which provision gives the company the majority. There is also a superintendent of the relief department whose duties are of a wide scope and include the approval and control of the medical director. How this superintendent is to be appointed does not appear; but in view of the general ascendancy of the railroad companies in all the affairs of the department, he must be an appointee of the companies, or at least under their influence. Medical examiners are provided for who are appointed by the medical director. Dr. Bourne was one of the medical examiners and, hence, it is important to note the duties of those officials as prescribed in the following section:

''12. The medical examiners shall make the required physical examinations of applicants for mem-

bership in the relief fund, prepare applications, report the condition of sick and injured members, decide when members are unfit for duty and when they are able to work, prepare claims for benefits, *certify bills for surgical treatment*, perform such other duties as may be required of them by the medical director, and conform to such rules as he may establish.''

There is also this clause as to what benefits a member gets:

''Payment for each day of disability by reason of accident for a period of not longer than fifty-two weeks, as follows:    To a member of the first class, fifty cents; second class one dollar; and at half these rates thereafter during the continuance of disability.    Also payment of such bills for surgical attendance as are approved by the medical director of the relief department.''

An employee desiring membership in the relief department has to sign an application containing many clauses, among which we note the following:

''I also agree that in consideration of the amounts paid and to be paid by said company for the maintenance of the relief department, the acceptance of benefits from the said relief fund for injury or death shall operate as a release and satisfaction of all claims for damages against said company, arising directly or indirectly from such injury or death, which could be made by me or my legal representatives.''

This regulation occurs:

''Should a member, or his legal representatives, bring suit against the company, or against any other corporation which may be at the time associated therewith in administration of their relief departments, for damages on account of injury or death of such member, no payment of benefits from the relief fund on account of the same shall be made until such suit is discontinued; and if such suit shall proceed to judgment or shall be compromised, all claims upon the relief fund for ben-.

efits on account of such injury or death shall be thereby precluded.''

Among the instructions given at the instance of the plaintiff were the following:

''2. The court instructs the jury that the defendant is liable for all negligent acts of its agents, within the general scope of their employment while engaged in the business of said railroad company and with the view to the furtherance of the railroad company's business. If the physician or surgeon who treated plaintiff's broken leg, did so in furtherance of defendant's interests and direction, and it was the defendant's physician and surgeon who undertook to set and treat and doctor plaintiff's broken leg, the defendant is liable for negligence, if any, of such physician, whether he was sent without pay from plaintiff to defendant, or was sent under and in pursuance of the obligations of a contract between plaintiff and defendant in which the defendant had obligated itself to furnish such physicians and surgeons in accidents like the one happening to plaintiff when his leg was broken and while in the service of the company.''

''4. The court instructs the jury that the defendant is liable for the negligent acts of its agents, is liable in all matters done in the course of the agent's employment, even though the defendant did not authorize the specific act done. To determine whether the act done was in the course of the agent's employment, it is only necessary to determine whether the agent was engaged in serving the defendant in the capacity in which he acted. If the physician who treated and operated upon plaintiff's broken leg, did so in the course of his or their usual employment with the defendant, then the act done was as the agent of the defendant.''

At the instance of the defendant the court instructed the jury that defendant was not bound by the employment of Dr. Smith by Dr. Bourne unless it had authorized the latter to make such employment, and the mere

fact that Dr. Bourne was medical examiner for the relief department was not sufficient proof of his authority in that regard; further, that if Dr. Smith was employed and exercised ordinary care and skill as a physician and surgeon in treating plaintiff, the verdict should be for the defendant; further, that if Dr. Smith's treatment was negligent and unskillful, defendant was not liable unless Dr. Bourne had authority to employ him, and the burden was on the plaintiff to prove Dr. Bourne had such authority. Such is the substance of the instructions given on behalf of the defendant.

This instruction was requested by the defendant and refused:

"The court instructs the jury that even though you find from the evidence that Dr. B. H. Smith was employed by Dr. J. J. Bourne professionally to treat plaintiff for the fracture of his right leg, being the fracture spoken of in the evidence, and even if you find that Dr. Smith did, in fact, pursuant to such employment, treat plaintiff for such fracture, and find that he, Dr. Smith, treated plaintiff in an unskillful and careless manner, yet defendant would not be liable for such carelessness and unskillful treatment, unless you further find that Dr. Bourne was careless and negligent in the employment of Dr. Smith."

The trial resulted in a verdict for the plaintiff in which his damages were assessed at $1,950; motions for new trial and in arrest were overruled, and the case appealed.

*H. H. Trimble, Palmer Trimble* and *R. W. Ray* for appellant.

(1) The company is not liable for the negligence of the surgeon who treated Haggerty, even though the company may have employed a surgeon to treat Haggerty. Elgmy v. Railroad, 93 Iowa 508; s. c., 61 N. W. 1056, 27 L. R. A. 296; York v. Railroad, 98 Iowa 553;

Maine v. Railroad, 109 Iowa 268; 1 Elliott on Railroads, sec. 223; 3 Elliott on Railroads, sec. 1388; McDonald v. Hospital, 120 Mass. 423; Ins. Hospital v. Boyd, 130 Pa. St. 624; Van Tassell v. Hospital, 12 R. I. 411; Laubersheimer v. S. S. Co., 107 N. Y. 228; Secord v. Railroad, 18 Fed. 221; Richards v. Coal Co., 32 Pac. 1013; Railroad v. Sullivan, 40 N. E. 138; Railroad v. Artist, 60 Fed. 365; O'Bryan v. S. S. Co., 154 Mass. 272; Haas v. Society, 26 N. Y. 863; Allen v. S. S. Co., 130 N. Y. 91; Railroad v. Price, 13 So. 638; Downs v. Hospital, 101 Mich. 555, 25 L. R. A. 602; Railroad v. Howard, 63 N. E. 872; Railroad v. Ziegler, 38 Pac. 282; Hearns v. Hospital, 31 L. R. A. 224; Powers v. Hospital, 109 Fed. 294; Clark v. Railroad, 48 Kan. 654; Quinn v. Railroad, 94 Tenn. 715; Railroad v. Earley, 28 L. R. A. 546; 2 Thompson on Negligence, p. 8; 1 Thompson's Commentaries on Neg., p. 578; Robinson v. Wobb, 11 Bush 564; Color Co. v. Canton, 92 Mo. 221; Andrews v. Baedecker, 17 Ill. App. 213. (2) The authorities heretofore cited and from which we have quoted, justify us in maintaining that Dr. Smith was not a servant of the railroad company. The term "servant" has a well-defined meaning, and a party sought to be charged with negligence of another person must be clothed with duties and powers of control over such other person, with respect to the act complained of and with respect to the mode of doing the act. This duty and power to control is the test. 2 Thompson on Negligence, p. 8; 1 Thompson's Commentaries on Law of Negligence, p. 578; Robinson v. Webb, 11 Bush 564; Color Co. v. Collon, 92 Mo. 221; Andrews v. Baedecker, 17 Ills. App. 213; Quinn v. Railroad, 30 S. W. (Tenn.), 1037; 1 Elliott on Railroads, sec. 223; 2 Elliott on Railroads, sec. 1388; Railroad v. Zeigler, 54 Kan. 340; Sullivan v. Railroad, N. E. 138; Railroad v. Price, 13 So. 638. The control spoken of is not only the power to set the servant to work, but to direct the manner of the work. (3) Instructions should not be mere abstractions without evi-

dence, on which to base them. Gorham v. Railroad, 113
Mo. 408; Wilmott v. Corrigan, C. R. Co., 106 Mo. 535;
Reed v. Bott, 100 Mo. 62; Porter v. Railroad, 71 Mo.
66; Lester v. Railroad, 60 Mo. 265; Turner v. Railroad.
51 Mo. 501; Ewing v. Goss, 41 Mo. 492; Chouteau v.
Searcy, 8 Mo. 734; Stokes v. Distillery Co., 64 Mo. App.
420; Moore v. Hawk, 57 Mo. App. 495; Cross v. Rail-
road, 56 Mo. App. 664; Harrison v. White, 56 Mo. App.
175; Fairgrieve v. Moberly, 29 Mo. App. 141; Cottrell
v. Spies, 23 Mo. App. 35; Benjamin v. Railroad, 50 Mo.
App. 602.

*Jerry M. Jeffries* for respondent.

(1) Every reasonable inference is against the
party demurring to the evidence. Buck v. Railroad, 108
Mo. 179; Young v. Webb City, 150 Mo. 333; Bank v.
Simpson, 152 Mo. 638. (2) In deciding whether plain-
tiff has a case for a jury, he is entitled to the most rea-
sonable interpretation of the facts as well as every fair
inference from those facts. Baird v. Railroad, 146 Mo.
265; Roe v. Annan, 80 Mo. 198; Kattleman v. Fire
Ass'n, 79 Mo. App. 447. (3). In the case under con-
sideration plaintiff alleged that defendant operated this
department for gain, that it had authority under its
charter to do so. Defendant denied that its object was
gain, but asserted that it was charitable. The proof,
beyond question, establishes that gain was and is its
object. . A corporation like an individual may ratify the
acts of its agents done in excess of authority. Marshall
County v. Schenck, 5 Wall. (U. S.) 772. (4) Appel-
lant's contention that the instructions given do not prop-
erly declare the law, or are not properly worded and
drawn to suit the facts in this case, are without founda-
tion or merit. All of them have been approved by this
court, and are upheld by the decision heretofore alluded
to in this brief. I do not deem it necessary to notice
them further than to refer to the following cases.

Stanley v. Railroad, 114 Mo. 606; Minister v. Railroad, 53 Mo. App. 276; Lannan v. Gas Light Co., 44 N. Y. App. 459; Johnson v. Hurley, 115 Mo. 520; Heppe v. Saylor, 53 Mo. App. 4; Smith v. Tel. Co., 57 Mo. App. 259; Frauenthal v. Ins. Co., 76 Mo. App. 15; Drug Co. v. Self, 77 Mo. App. 284.

GOODE, J.—1. The point is raised that the petition does not state a cause of action, wherefore the motion in arrest ought to have been sustained. No objection to the petition was taken before verdict by demurrer or motion, or by opposing the reception of testimony to prove its averments. But we think the petition pleads a cause of action that would have been good against a demurrer, and is certainly good at this stage of the proceedings. The cause of action stated is that the defendant obligated itself to furnish competent and skillful physicians and surgeons to attend injured employees who were members of the relief department; that in disregard of said obligation it furnished unskillful surgeons who treated plaintiff in a negligent way to his detriment, and that he submitted to treatment by said surgeons on account of the contract between him and the defendant company for surgical attendance by virtue of his membership in the relief fund. The objection made to those allegations is that they state a conclusion of law instead of facts; but we think they state the ultimate facts according to their legal effect in creating a certain contract, instead of stating the evidence in detail; and this is good pleading. Pye v. Rutter, 7 Mo. 548; Page v. Freeman, 19 Mo. 471; Jones v. Louderman, 39 Mo. 287; Kansas City v. Johnson, 78 Mo. 661; Long v. Armsby Co., 43 Mo. App. 253. It would have been improper for the plaintiff to set out all the regulations of the relief department in order to show a contract or obligation on the part of the defendant to furnish skillful surgical attendance to injured members, while it was proper for him to aver that such

an obligation existed. Reilly v. Cullen, 159 Mo. 322. Whether he proved it or not is another question.

Accepting defendant's contention that it is liable only if it failed to exercise due care in selecting a surgeon and is not liable for the surgeon's negligence, enough was stated in the petition to constitute a cause of action on the theory that the defendant was negligent in making choice of surgeons to wait on plaintiff. As we have pointed out in the statement, the use of the word "proper" in the paragraph we have quoted from the petition, instead of the word "improper," is manifestly a clerical error; for the latter word is shown by all the allegations of the petition to be the one meant. Other excerpts might be quoted from which an intention to allege want of due care by the railroad company in selecting a physician may be deduced. Failure to allege a fact without which the jury could not have rendered their verdict, is cured by verdict if the existence of the fact can be gathered by reasonable intendment from those definitely averred. Munchow v. Munchow, 96 Mo. App. 553; Bank v. Railroad, 46 Mo. App. 555.

The case, however, was not submitted to the jury on the defendant's theory, and any imperfect allegations may be cured hereafter by amendment. The petition is desultory and can be worked over with advantage.

2. It is insisted no evidence was adduced by the plaintiff tending to prove that in point of fact Dr. Bourne employed Dr. Smith, and this contention is strenuously urged as sufficient to defeat plaintiff's demand. We do not lay so much stress on it as defendant's counsel do, who treat the case as though the question of the railroad company's liability depends entirely on whether Dr. Bourne hired Dr. Smith, and if he did, whether he acted by authority. But this is narrowing the issues joined by the pleadings. The petition does not base plaintiff's right to recover solely on maltreatment by Dr. Smith, nor state a case in which the surgery of Dr. Smith is alone called into question. Throughout,

it treats Bourne and Smith as two physicians who were employed by the company, pursuant to its obligation, to attend plaintiff, set his leg and give him surgical attendance until it healed; and, we think, there was evidence tending to prove that Smith and Bourne both treated the case.   Bourne himself testified that he visited the plaintiff every month, after the accident happened, until August.   He also testified to giving him advice about abstaining from work; while Haggerty testified that Dr. Bourne told him on two occasions he was strong enough to go to work, inquired about his limb at different times, advised him about leaving the splints off, examined it, and, at the time of his first visit, said he would turn the case over to Smith; that afterwards when he expressed dissatisfaction with the setting of his leg and wanted it re-set, Dr. Bourne said that was unnecessary and might produce a worse result. Dr. Bourne does not deny conferences with Dr. Smith about the case, but contends such incidents were merely informal talks between two doctors, one in charge of a case and the other casually observing it, instead of regular professional consultations by surgeons giving joint treatment.   His visits he explains by saying it was his duty as medical examiner of the relief department, to visit all patients in order to keep the superintendent posted as to how long they were entitled to benefits and when they were well enough to resume work.   Such facts warranted the inference, if the jury thought proper to draw it, that Dr. Bourne was an attending surgeon; though they are compatible, too, with defendant's theory.

3.   Bourne's right to employ Smith is still more earnestly questioned; but we think that issue was for the jury under the evidence.   The passage of the answer recited in the statement of facts alleges that the relief department had the option to furnish members surgical attention when injured, or refrain from doing so, but that the practice was to allow the injured member to

select his own surgeon.   Dr. Bourne testified that while
it was customary in certain cases to pay bills for treat-
ment, it paid them only when the member was disabled
by an accident.   Further, he said, in effect, that if he
was satisfied the surgery a member was receiving was
unskillful, he would make a report of it; that the relief
department could advise as to the surgeon but could not
change one against the patient's will.   Moreover, the
regulations of the department directly empowered med-
ical examiners to certify bills for surgical treatment;
and those facts, while they do not conclusively prove
Dr. Bourne was authorized to employ Dr. Smith, war-
rant the inference that he might do so without exceed-
ing his duty; and, in fact, his authority was practically
admitted when the answer said the relief department
might, if it deemed best, employ surgeons for disabled
members.   There is evidence to show this right was
exercised in this instance, whether it ever was in any
other or not; and as the pleadings and evidence stand,
a case was made for the jury as to whether the defend-
ant was remiss in performing its duty.   What its duty
was we will now inquire.

4.   Granting that the plaintiff was negligently and
unskillfully treated by physicians employed by the de-
fendant company, the question arises whether the com-
pany's responsibility is to be determined by the doctrine
of *respondeat superior;* in other words, whether the
defendant is liable for their malpractice if it was rea-
sonably careful in selecting them; or is only liable if
it was not careful in that respect.

In seeking to answer this principal inquiry accord-
ing to some appropriate rule, close attention should be
paid to the particular facts before us in comparison with
the precedents cited, in which we find several rules of
decision prescribed in cases analogous to this one, but
different in important circumstances.   We are referred
to a line of decisions holding that hospitals and other

bodies politic intended for charitable purposes, or to assist in the performance of some function of government without expectation of profit, are not responsible for the negligence of servants and employees unless they are remiss in choosing them. Among cases which applied that rule to establishments because they were charities are: McDonald v. Hospital, 120 Mass. 482; Benton v. Hospital, 140 Mass. 13; Haas v. Society, 26 N. Y. Supp. 868; Pryor v. Hospital, 15 N. Y. Supp. 621; Maxmilian v. Mayor, 62 N. Y. 160; Downs v. Hospital, 101 Mich. 555; Perry v. House of Refuge, 63 Md. 20; Mias' Admr. v. Hospital, 97 Va. 507; Heriot's Hospital v. Ross, 12 Clark. & F. 507. Judgments exempting the defendants from responsibility in the following cases, some of which were for negligent attention in hospitals, were rested on the rule of the non-liability of persons or corporations performing a public duty, for the torts of agents and servants: Murtaugh v. City of St. Louis, 44 Mo. 479; Richmond v. Long, 17 Gratt. 375; Ford v. School Dist. 1 L. R. A. 607; Williamson v. Industrial School, 95 Ky. 251; Williams v. Indianapolis, 60 N. E. 367; Brown v. Vinalhaven, 65 Maine 402; Sherburne v. Yuba County, 21 Cal. 113; Summers v. Davies County, 103 Ind. 262; Gilbert v. Trinity House, L. R. 17 Q. B. 795. In numerous cases the exemption of eleemosynary trustees and corporations from the rule of *respondeat superior* is put on the ground that they hold their funds in trust for designated uses of a charitable nature, and that if the funds were taken to compensate for the torts of servants they would be diverted from the ends intended by the founder, whether the founder be the State or an individual.

In opposition to this doctrine it has been pointed out that the same principle, logically extended, would exempt such bodies from liability for any tort of a servant; whereas, there are various torts for which all employers are held responsible even though they are

engaged in public charity. Stewart v. Harvard College, 12 Allen 58; Davis v. Society, 129 Mass. 367; Bleachinska v. Misson, 9 N. Y. Supp. 679; Gilbert v. Trinity House, supra. The result has been that the later judgments have apparently renounced the notion that whatever immunity from the law of *respondeat superior* is enjoyed by those bodies, is allowed in order to protect trust funds and public money from outlays not contemplated by the donor or the Legislature. Mercy's Dock's Trustee v. Gibbs, L. R. 1 H. L. 93; Powers v. Hospital, 109 Fed. 294; Herns v. Waterbury Hospital, 66 Conn. 98; Foreman v. Mayor of Canterbury, L. R. 6 Q. B. 214; Coe v. Wise, 5 B. & S. 440; Winch v. Conservators of Thames, L. R. 7 C. P. 458. Recent cases which exonerate charitable institutions from liability for certain negligent acts of employees, such as unskillful treatment or nursing, appear to do so on the theory that a patient in accepting gratuitous attention of that kind assumes the risk of injury by the carelessness of employees. Powers v. Hospital, supra, and cases cited. Other courts, in total dissatisfaction with the rule and its various reasons, have repudiated it altogether and hold those bodies as much subject as others to the doctrine of *respondeat superior*. Glavin v. Hospital, 12 R. I. 411.

The exception to the rule of *respondeat superior,* allowed when an injury occurs from the negligence of a servant employed by trustees or by a body politic engaged in discharging a governmental function, was considered in many of the cases cited; among others by the Supreme Court of Missouri is Murtaugh v. City of St. Louis, 44 Mo. 479, an action instituted by the plaintiff Murtaugh against the city of St. Louis for the misconduct of servants in the city hospital which caused injury to him. The city was held not answerable for the misfeasance, in deference to a rule thus stated:

"Where the officer or servant of a municipal corporation is in the exercise of a power conferred upon

the corporation for its private benefit, and injury ensues from the negligence or misfeasance of such officer or servant, the corporation is liable, as in the case of private corporations or parties; but when the acts or omissions complained of were done or omitted in the exercise of a corporate franchise conferred upon the corporation for the public good, and not for private corporate advantage, then the corporation is not liable for the consequences of such acts or omissions on the part of its officers and servants.''

We have paid more attention to the foregoing authorities than we think they deserve for present purposes, because they are all relied on by the defendant as exactly in point, whether they deal with institutions purely charitable, like hospitals, or with bodies created to serve the State in handling its funds for the benefit and convenience of the public at large, such as road commissioners and dock trustees. But in our judgment neither class of decisions is in point. It is obvious, of course, that neither the defendant railroad company nor its relief department is the trustee of public funds put into its hands to use in a prescribed manner. But the argument is pressed that the relief department, organized and controlled by the company, was of a charitable nature and, hence, by the principle of some of the cases, the defendant is exempt from liability for the negligence of the surgeons, even though they treated the plaintiff under its employment, unless it was negligent in selecting them. Some countenance is lent to this contention, which would otherwise strike us as plainly fallacious, by the opinion of the United States Circuit Court in Artist v. Union Pacific Railroad Co., 60 Pac. 365, in which an arrangement in most respects similar to the one in hand was regarded as a charitable enterprise.

The test of whether such an enterprise is charitable is said to be its purpose, and if the purpose is to make a profit, it is not charitable; if it is to relieve the sick or disabled without gain, it is charitable. The defini-

tion of a charity, given in Jackson v. Phillips, 14 Allen 556, is generally accepted, and is as follows:

"A charity, in the legal sense, may be more fully defined as a gift to be applied, consistently with existing laws, for the benfit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government."

Of similar import to the Artist case is that of Fire Insurance Patrol v. Boyd, 132 Penn. St. 624; but all others we have seen are to the contrary.

In our judgment the relief department, organized by the defendant company, in view of the regulations provided for its government, can not be classed as a charity without doing violence to every significance that word bears, either in popular or legal usage. It is not a charity within the definition of Justice GRAY, above quoted, because the fund administered is not a gift by the employees who make contribubutions; much less by the railroad company, which does not make any, unless a deficit occurs. The fund is made up from sums contributed by members for their mutual benefit and is to be enjoyed by them if they suffer from sickness or accident. It is, in effect, a provision made by the employees to insure a stipend for them to live on if they are disabled, and a benefit to their families if they die. In addition to this, if disabled by accident, their medical attendance is paid out of the fund. This strikes us as a purely business arrangement on the part of the employees of the railroad company. But to call the enterprise a charity on the part of the company itself, is extravagant, when we note that one of its purposes, as carved in high relief on the face of the regulations, is to prevent damage suits. Enterprises much more benevolent have been excluded from the list of

charities by the courts. Chapin v. Y. M. C. A., 165 Mass. 280; Donnelly v. Association, 146 Mass. 163; Newton v. Protective Assn., 151 Mass. 215.

In the Newton case, an association much like the one dealt with in Fire Ins. Patrol v. Boyd, was ruled to be a private business enterprise. In the Donnelly case, a private cemetery association which earned no profits and declared no dividends, was held to be a private business company and liable for the negligence of a grave-digger whether carefully selected or not. In the Chapin case the Young Men's Christian Association was decided to be not so entirely charitable as to exempt it from responsibility for its servants' torts, though it is largely charitable and in no sense commercial. To give such organizations as the one before us the legal status of a charity and determine the employer's liability on that theory, is not only illogical, but must ultimately prove pernicious by subverting to commercial and selfish uses, principles of law designed to protect only benevolent institutions. We decline, therefore, to accede to the argument of defendant's counsel, that plaintiff has no case because, if treated by the company's physicians, he was the recipient of charity.

5. The petition charges that the defendant bound and obligated itself to furnish the plaintiff, as a member of the relief department, competent and skillful surgeons to wait on him, and if such a contract was in fact made, defendant is, of course, answerable if it failed to perform; that is to say, if it furnished a surgeon whose lack of skill resulted in injuring the plaintiff. Ward v. St. Vincent's Hospital, 57 N. Y. Supp. 784; Richardson v. Coal Company, 20 L. R. A. (Wash.) 338. But no evidence was adduced to show that any such contract or obligation was ever created by express words, and if one existed it arose by implication from the regulations of the relief department. Those regulations imposed no duty on the railroad company or its

relief department to furnish surgeons, skilled or otherwise, for sick and disabled members. All that is said bearing on that matter is, that the medical examiners may certify bills for surgical attendance and that members accidentally hurt are entitled to payment of such bills if approved by the medical examiner. This, of course, in no sense deprives the member of the right to select a surgeon himself, nor makes it incumbent on the relief department to furnish one. But for the statement in the answer that the relief department in its discretion could either furnish the members surgery or pay bills incurred therefor by the members themselves, the record would be barren of evidence tending to show the relief department of the railroad company had any power or duty in respect to furnishing medical attendance to injured members. The effect of that admission is that the company might furnish attendance, but was not bound to do so.

6.   But, we have held there was evidence tending to prove that in this instance the railroad company did hire surgeons to treat the plaintiff, though there was none to show he did not willingly accept them or preferred any one else. Unquestionably if it undertook to supply plaintiff with surgical attendance or deprived him of a choice in the matter, it was bound to employ reasonable care to get men of average skill. But did its obligation end there? As we have seen, to be exempted from the rule of *respondeat superior,* some other ground of immunity must be found than that it was conducting a charity.

Underlying the various decisions and discussions of the subject is, we think, the unwillingness of courts to widen the scope of the doctrine of *respondeat superior* so as to embrace a case like this. Hearn v. Hospital, 66 Conn. 98. That doctrine is one of recent origin and is enforced as a measure of public policy; probably because employers are generally financially

responsible and employees are not.   In so far as it is
justified by principle at all, it is on the assumption that
a master can control his employee's acts, expects to
derive a benfit from them, and, therefore, should be
held responsible if they result in injury to others.
Modern conditions make it imperative to hold many
employers responsible for the torts of their servants
as a means of enforcing care in the prosecution of dan-
gerous enterprises and the handling of dangerous imple-
ments and machinery.   Railroad companies must see
that their servants are cautious in operating trains,
make all needful regulations, select their employees
with that end in view and discharge them when they
are careless and unskillful.   The application of the rule
in question is especially called for when the misfeasance
of the employee happens while he is engaged about the
main business of his employer.   In cases like this the
surgeon is not regarded as sustaining, in full measure,
the relation of servant to the railway company.   That
relation carries the right of direction and control of
the servant by the master as to the mode in which the
former shall do his work; and when an employer, in-
stead of reserving in terms or by implication the right
of direction, contracts for the exercise of independent
judgment and skill on the part of the person employed,
the latter is often regarded as a separate contractor
and alone responsible for his torts.   Mound City Paint
Co. v. Conlon, 92 Mo. 221; Andrews v. Boedecker, 17
Ill. App. 213; Robertson v. Webb, 11 Ky. 464; Wiltsie
v. Bridge Co., 63 Mich. 639.   This doctrine has been
accepted as the rule of decision in controversies like
the one in hand.   Pearl v. Railroad, supra; Quinn v.
Railroad, supra; Myers v. Hoffman, 58 N. J. L. 193.

The defendant company was not primarily engaged
in ministering to sick and disabled persons for profit,
but when it gave such ministrations did so as an
incident to its regular business.   There is little likeli-
hood of railway companies, or other employers, becom-

ing careless in the selection of physicians to wait on employees; and as their business managers and superintendents are not selected for their expert knowledge of medical and surgical matters, they are unfit to supervise the work of physicians, and, therefore, the doctrine of *respondeat superior* can not well be applied to such matters. We think these are the real reasons why the courts have refused to extend the rule to them; and we need not be troubled because this course is inconsistent with the general doctrine that masters are answerable for the torts of servants, since the law aims at practical rather than theoretical ends, and regulates acts with reference to their consequences instead of their logical connection. The precedents, without exception, hold that unless the evidence shows want of care in the selection of the surgeon, the servant injured by malpractice has no recourse against his employer. Maine v. Railroad, 109 Iowa 553; York v. Railroad, 98 Iowa 554; Donald v. Railroad, 93 Iowa 284; Eighmy v. Railroad, 93 Iowa 538; Atchison, etc., Ry. v. Zeiler, 54 Kan. 340; Clark v. Railroad, 48 Kan. 654; Railroad v. Sullivan, 141 Ind. 83; Railroad v. Price, 37 Fla. 46; Quinn v. Railroad, 94 Tenn. 715; Artist v. Railroad, supra; Pierce v. Railroad, 66 Fed. 44; Secord v. Railroad, 18 Fed. 221; Railroad v. Howard, 45 Neb. 570; Allen v. Steamship Co., 132 N. Y. 91; O'Brien v. Cunard Co., 154 Mass. 272. The cases against steamship companies arose under an act of Congress imposing on those companies the duty to keep a competent physician on each ship to wait on sick passengers. The construction given to that statutory duty is, that it extends no further than the exercise of reasonable care to get a competent physician, which being done, the company is not responsible for damages caused by his unskillful treatment of a patient.

Maine v. Railroad Co., 109 Iowa 551, passed on the very arrangement before us in this case, to-wit, the voluntary relief department of the Burlington Railroad

Company and its regulations. The conclusion reached was, that the duty of the company by virtue .of said regulations is.the exercise of care in the selection of a physician, if it undertakes to furnish one. This was also the decision in Eighmy v. Railroad Co., and Railroad Co. v. Zeiler, supra, and several other cases cited above which differ from the present case in no important particular. To the same effect are the text-books. 1 Elliott on Railroads, sec. 223; 3 Elliott, sec. 1388.

It follows from the above considerations and authorities that the circuit court erred in refusing the instruction requested by defendant which is set out in the statement, and in giving several instructions asked by the plaintiff. The case should have been tried on the theory pointed out, to-wit, that the liability of the defendant depends on whether it exercised due care in selecting physicians to wait on the plaintiff, if it furnished him with physicians. Instead of that theory being followed, the effect of the instructions to the jury was to leave it entirely out of view and to hold the company liable for the surgeons' incompetency, however cautiously they may have been chosen.

The judgment is reversed and the cause remanded. *Bland, P. J.,* and *Reyburn, J., concur.*