MARY COFFEY, Respondent, v. FLAVEL B. TIF-FANY and JOSEPH W. HOWARD, Appellants.

Kansas City Court of Appeals, July 6, 1914.

1. PHYSICIANS AND SURGEONS: Malpractice: Damage for Wrongful Treatment of Eyes.   A physician entitled to practice his profession, possessing the requisite qualifications, and applying his skill and judgment with due care, is not ordinarily liable for damages consequent upon an honest mistake or an error of judgment in making a diagnosis, in prescribing treatment or in determining upon an operation, where there is reasonable doubt as' to the nature of the 'physical conditions involved or as to what should have been done, in accordance with recognized authority and good current practice.

2. ———: ———: ———. A physician or surgeon is not an insurer that he will effect a cure, nor that his diagnosis or treatment of the case will be free from honest errors. He is not required to come up to the highest standard of skill known to the profession and when he accepts employment is bound only to exercise such reasonable care and skill as usually is exercised by physicians and surgeons in good standing.

3. EVIDENCE: Negligence: Presumption. Proof of a failure to cure, or that a bad result appeared to follow a physician's treatment, of itself, raises no presumption of absence of proper skill and attention, or of negligence in giving the treatment.

4. ———: Qui Tacit Consentire Videtur.   Testimony of declarations made by a stranger to a cause of action in the presence of one of the parties defendant to which the latter did not reply should never be received unless the evidence is of direct declarations of the kind which naturally calls for contradiction and which the accused understands and comprehends and is at liberty to make a reply.

Appeal from Jackson Circuit Court.—*Hon. Harris Robinson,* Judge.

AFFIRMED. (Judgment quashed on writ *certiorari* by Supreme Court.)

*Fred A. Boxley, Scarritt, Scarritt, Jones & Miller* and *Denton Dunn* for appellants.

*Park & Brown* and *Atwood & Hill* for respondent.

JOHNSON, J.—This is a malpractice suit. Defendants are practicing physicians in Kansas City and specialize in diseases of the eye. Each has had long experience in that profession and is recognized as a skillful and able practitioner. During the events in controversy Dr. Howard had his office with Dr. Tiffany and practiced both independently and as the assistant of Dr. Tiffany.

Plaintiff, a spinster forty-seven years of age, was a teacher of piano music and lived with her sister who was a school teacher. She had always been near-sighted and had worn glasses since early youth. According to her evidence she had had no other trouble with her eyes and used them without difficulty in the instruction of pupils of which she had a large class. On Saturday, February 6, 1909, she gave a well-attended piano recital at which she turned the music for the performers and to all outward appearances, her eyesight at that time was unimpaired. A number of witnesses who knew her intimately testified that, aside from short-sightedness, her eyes seemed normal and strong before she consulted defendants. Plaintiff testified that "a few days before that (the piano recital), I noticed before the left eye what apparently seemed to be little black specks, and they were annoying to me, as they would come and go and sometimes I would take my hands, as if to brush it away and then it was gone." On Monday morning following the recital, plaintiff attempted to call Dr. Tiffany by telephone to arrange for the examination and, if neces-

sary, treatment, of her left eye, for these floating
specks. He was away on a vacation but the young
woman who was in his office as clerk answered the
telephone and arranged for plaintiff to come to the
office the next day and when plaintiff, accompanied by
her sister, called, pursuant to this arrangment, the
clerk received her, asked her a number of questions
and recorded her answers in a large record book.
Plaintiff stated: "She said to me that she would like
to have me state what I came for, and she began by
taking my name and address, and age, and then she
asked me about my eyes. She said, 'I see you wear
glasses.' I said I had worn them for near-sighted-
ness since I was nine years of age, and then I told
her as nearly as I can remember just what I told you,
about these little black specks floating before my eyes,
coming and going, and that the glasses I was then
wearing had been fitted by an optician instead of by
an oculist, and that I thought I would let Dr. Howard
see if he could give me—if they were correctly fitted,
and then he could examine my eye, and see if there
was anything wrong with it.

"Q. Did this conversation take place in the
presence of Dr. Howard? A. Yes, sir." Plaintiff
then inquired of the clerk about the fee of Dr. Tiffany
and was assured that "if no one had sent me she did
not think he would be exorbitant."

Dr. Howard who was attending to Dr. Tiffany's
practice in his absence then proceeded to examine
plaintiff's eyes and made the usual chart tests. Plain-
tiff testified: "Then he covered up my right eye, and
said for me to read it with the left eye alone. I begun
testing the eye, I said that was the eye that had
specks before it, but I did not say whether I could or
could not see, was just beginning, when very sud-
denly he took his hand that way (indicating), and
turned it around in front of me, and said, 'How many

fingers did I hold up?' I said, 'Why, three fingers.' I said, 'I did not mean, Dr. Howard, I could not see out of the eye. I meant that I had had a specky condition, and I wondered about it.' And then he said he would try some other lens, to see if he could find anything I could see further with, and he tried two or three different glasses, and it was just about the same with each glass. I did not see any different, and I told him so; and he seemed in something of a hurry. He said he believed the glasses were fitted correctly, but we would go into the dark room, and he would examine the eye, and we went into the dark room. . . . after he covered the right eye, threw the light into the left eye, and took up a glass and began looking in the eye, and he looked for a period and then he says, 'I don't see anything wrong with the eye at all;' and, after awhile, he says, 'There is nothing the matter with the blood vessels, that is certain, for the reflex is too good,' and he spoke several times how good the reflex was. Then he told me to close my eyes, and he took his fingers and pressed on the ball of my eye, on top of the lid, and he says, 'The tension is good; there is no retinal trouble, the tension is good.' Then he took up the glass again, and he says, 'Well, it does seem to me that way at the back of your eye I can see some little black specks;' and I says, 'What would that indicate if you saw them? Anything serious?' He said, 'Oh, no, nothing serious. It might indicate it needed flushing,' and I supposed that he meant my system, but I did not inquire into it specially. .. . . I told him I would pay for the examination, and he told me to wait until Dr. Tiffany returned; that he attended to those matters. I went out into the other room my sister and I and started to put our wraps on."

While they were putting on their wraps, Dr. Howard came in and requested them to remain longer. "He said," plaintiff and her sister testified, "he felt

as if he would like to put something in, to dilate the pupil and then make another "examination the next day. . : ". he dropped something into the eye, into the corner of the eye; and we sat down, and in probably five minutes he came and dropped something in again; and then he came back again in about not longer than five minutes, and I have not been able to recall whether he dropped anything in that third time or not, but I think that he did, but, at any rate, he told us to go downstairs, and sit for a little while, that he was not through putting in yet, that he would be down and put some more in. . . . after a little time he came down and dropped in again, after starting to put it in my sister's eye, and finally saw the difference, and put it in my eye, and then he told me he wanted me to come back next morning for another examination of the eye; . . . I didn't notice anything especially out of the way that afternoon excepting that I did notice a peculiar dryness."

Plaintiff returned alone to the office the next day. She states that Dr. Howard "looked at the eye, and said the pupil was not as large as he wanted it, and I protested; it seemed to me it was about as large as it could be. . . . he said, 'No, it was not as large as he wanted it, and he dropped into my eye again, and told me to sit down and he would drop it in until it was as large as he wanted it, and he dropped it in at intervals until he had dropped in about six times, . . . He said it was large enough and we would go into the dark room and he would make another examination, and we went into the dark room, and only stayed there a short time, with the same result; he said he didn't find anything wrong, and we came out into the other room, preparatory to my leaving, when he said to me . . . I would like to put some different kind of medicine into your eye.' He said, 'It will turn it red, make it swell up, and look very badly,

but,' he says, 'that will all pass away, and your eye will be clear and I believe that is everything you will need for your eye.' . . . He put two medicines in. . . . he took up one bottle first, from the swinging table in front of where I was sitting, it was a rather large bottle, about that long and wide (indicating); it had some kind of dark fluid in it, I noticed it specially, but he did not use it, put it down, then he took up a smaller bottle, and put that down, and turned away for an instant, and turned back for something else, and took something out of the bottle. . . . and he dropped into the corner of my eye quite a quantity of something. I remember after he done it, it ran down my cheek, I had to wipe it away with my handkerchief. . . . It was so severe it seemed . . . the eye was paralyzed, not much feeling in it at that time.''

It was near the noon hour and plaintiff returned home. Immediately after leaving the office her face began to swell and other symptoms of injury to the eye ensued and grew in intensity during the afternoon. She gave lessons until three o'clock, when she found herself unable to go on with her work. She thus describes her condition: ''The left side of my face was swollen a great deal . . . the left eye was entirely closed . . . the right eye was partially closed and the swelling extended into my neck and forehead.'' On looking into a mirror that evening she discovered that ''my left eye was about half open, the lid drooping but I could not see anything out of it at all. . . . it felt as though it was still tightly swollen shut. It was difficult for me to think it was not, owing to the fact that when I closed the right eye I could see nothing at all, could not see the light or anything.''

Plaintiff's sister telephoned Dr. Howard about the condition of her eye and the next day plaintiff

again visited defendant's office. She testified, "he (Dr. Howard) turned around, and the first thing he said was, 'Well, well, such a thing would not have happened once in a hundred times.' I told him I was greatly distressed, because of the fact I could not see anything at all. He said, 'Never mind,' it would become right—it was lasting longer than he had expected, something of that kind. Then I appealed to him if the sight would come back, and he said, 'Yes,' that everything would become right again; and then I asked him if he knew anything to do—  .   .   .   and he got something and dropped it into the eye; I asked him if it was for the relief of the condition, and he said, 'Yes,' and he dropped it in several times, and finally he came over to me and said he believed he would use that differently, that he would put it right on the pupil, is what he said, and he worked something —I supposed it was a dropper, but I can't say—I did not see it—right under the lid, about the central part of my eye, and he pressed very hard on it, and then what I supposed to be drops—eye drops—flew out all over my eye, and it caused me to jump, and it pained me, and of course I could not see at all, but I did not know what effect it had on the eye.

Plaintiff asked when Dr. Tiffany would return and was told that he was expected the following Monday (this was Thursday) and that she would be notified. On that day she and her sister found him at his office, were introduced to him by the clerk, and the following conversations and events occurred: Plaintiff testified: "I told him I had made three visits, and I told him that I wanted to see him, but they said Dr. Howard was acting for him and was his assistant and that he was as competent as he, and I might just the same see him, just the same as Dr. Tiffany.  .   .   . He (Tiffany) said that was correct, that I was, in fact, his patient; and then he could not see us just then,

but that he would see us a little later, and Dr. Tiffany and Dr. Howard went out of the room, and remained out probably for about fifteen minutes; then Dr. Tiffany came back by himself, and he came over, and said he would see us then. Then he did stop and asked Miss McAllen (the clerk) to read from the large book, and she read a little—I didn't hear what she read, and we went into the same dark room. . . . I told him of the swelling and the paralyzed condition, and the lid was drooping over the eye still and was still red, and he took up a glass and looked a little and said he could not make an examination in the condition it was in, but he said Dr. Howard had not done anything in the treatment of the eye, that there was nothing wrong with it, and my sister spoke up and said, 'You see the condition she is in; if the treatment did not hurt her any, what is the trouble with her?' He said he didn't know that, but he did know the treatment did not hurt her, and she asked him while Dr. Howard came into the room, I think just about that time, and he said, 'There is no reflex in this eye at all. . . . and . . . there was none the first morning she came in.' My sister said, 'Dr. Howard, didn't you tell us the first morning we were in here that the blood vessels were all right, because the reflex was so good?' "

Dr. Tiffany said, "You are looking for trouble." plaintiff disclaimed any thought of making trouble and appealed to him to use his skill to remedy the condition of the eye. We quote further from her testimony: "He asked me what I thought Dr. Howard did. I said, 'Well, he put the medicine in my eye again, again, and again.' I said, 'If what he put in was atropine or belladonna, it seemed almost criminal to use such a deadly poison so repeatedly on anyone.' . . . Q. What did Tiffany say to that? A. I don't recall that he made any answer to that, but I went on and

said, 'You see the pupil of my eye, it is still very large, it has not gone down at all, and it seems to me at this time it ought to be going down a litle bit,' and he took his thumb and fingers, that way (indicating) and he says, 'I can take it down that quick, but I don't want to.' I said 'Why?' He said, 'It might injure the eye.' Q.. What was then said by either Grace, Dr. Tiffany or yourself, anything about trying to help you, treating you, or how you would be treated? A. Yes, after I told him I didn't think of making him any trouble at all, he began—he said I had shown confidence in Dr. Tiffany, in coming to him, and he would see what he could do for the eye, if I wanted him to. I told him I understood that his treatment would be just the same as Dr. Howard's and he said it would. I said my experience made me afraid of that kind of treatment, and then he said, 'Just go, then.' And we got right up then. Q. He said what? A. 'Just go.' "

Plaintiff is totally blind in the left eye and the vision of the right eye is greatly impaired. She had been making $100 per month teaching music, but since the injury her earning capacity is so greatly reduced that she is unable to earn more than $20 per month. She is corroborated in her testimony by her sister, the pupil whom she was compelled to excuse on the afternoon of her injury, and by numerous friends whose testimony tends to show that the medicine put into her eye produced an immediate and profoundly injurious effect upon it.

She brought this suit August 18, 1909, six months after the injury. The summons was served by a deputy sheriff who was introduced as a witness by plaintiff, and testified to what occurred at defendants' offices when Dr. Howard was served. Dr. Tiffany was not in and after the papers were served on Dr. Howard, he and the witness went downstairs (the offices

were on two floors) when .Dr. Howard called upstairs to the clerk who had received plaintiff, and asked if she "had a record of the Mary Coffey case." The clerk answered she had and that plaintiff "was the school teacher that he .dropped iodine in her eye and put it out." Dr. Howard, who was standing by the side of witness, said nothing. Each .defendant objected to this testimony and the court sustained ·the objection of Dr. Tiffany but overruled that' of Dr. Howard.

After severing her relation of patient to defendants, plaintiff consulted and was treated by other specialists, but without benefit. She did not call them as witnesses nor did she offer any expert evidence.

Dr. Howard testified that when plaintiff first consulted him "she said that on the preceding Thursday morning—five days before, when she awakened, her left eye felt like it was full of water and she was unable to see out of it, and that she had not been able to see out of it since, until on the day before it had cleared up a little bit. I then placed her in front of the chart. . . . which was twenty feet away, on the opposite side of the room, bright light reflected on it, and asked her to remove the glasses she was wearing, and read for me as much as she could on the chart. She could not see any letters on the chart with both eyes. . . . With the right eye she had to go within two feet of the chart—that is the left eye was covered— she went within two feet of it, to see the large letter, which is about three and one-half inches long. She could distinguish it when she got that close to it, tell what is was, with the right eye; but with the left eye she could not see it, no matter how close it was." Witness then examined her glasses and found she was wearing "a minus eight dioptric lens." He further tested her left eye and discovered she was practically blind in that eye, being able to distinguish only be-

tween light and darkness. He turned his attention to
the right eye and after trying different lenses found
that with "a minus sixteen lens he could give her a
twenty per cent. vision in that eye." In other words
his testimony is to the effect that plaintiff's eyes were
eighty per cent. defective at that time, as it is con-
ceded they are now and were immediately after the
treatment he gave her. He took plaintiff into the dark
room and examined her eyes with an ophthalmoscope.
In the right eye he could get a bright reflex from the
retina, could see the optic nerve and blood vessels
and learned from these disclosures that nothing was
wrong with that eye but "a high case of myopia" or
short-sightedness. The fact that plaintiff was wear-
ing "a minus eight dioptric lens indicated a malignant
myopia as lenses of more than six dioptrics are not
used except in malignant, i. e., progressive cases which
frequently end in total loss of sight. As we under-
stand the expert evidence of defendants, progressive
cases are due to a very low grade of inflammation in
posterior parts—the *choroid* and *sclera*—caused by
the constant tendency of the retina to come forward
and meet the focus of light and this inflammation fin-
ally invades into the vitreous humor and breaks it
down until it becomes too opaque to permit the trans-
mission of light rays. After examining the right eye,
Dr. Howard looked into the left with the aid of the
ophthalmoscope and "could not get any reflex; it was
dark so I could not see anything in the eye; the reflex
was lost. . . . It (the vitreous humor) was cloudy,
turbid, I could not see through it, I could not project
any light through it, could not project the strongest
light through it. . . . a person in that condition
would be practically blind in that eye." Witness then
examined both eyes as to tension and hardness and
found them normal so that the affection of the left
eye which caused its blindness consisted of the opacity

192 App. 30.

of the vitreous humor, and this condition was produced by the slow but insideous inflammatory process we have described.

Following these tests and examinations, witness dropped a one per cent solution of atropine sulphate into the left eye to dilate the pupil to see "if I possibly could get any light into it. . . . that was the only eye that was diseased. I could look into the other eye that is the only one that she came for the purpose of having me examine as to its blindness." After the lapse of fifteen minutes witness again examined the eye and found that "by using the strongest lights I had, I could not get any light into the eye—that is into the posterior eye . . . the reflex was lost . . . the vitreous humor was turbid, cloudy so I could not get any light through it . . . there was no sight." He told plaintiff she was blind in that eye and then took her to the treating room and dropped an eight per cent solution of dionin into her eye telling her that it would make the eye red, make it water and make the conjunctiva (lining of the lids) swell some. Witness states he put in this drug "to clear up the cloudy condition of the vitreous."

When plaintiff came to the office the next day (Wednesday) witness examined the eye with the ophthalmoscope and found no vision—no reflex and that he could not project light through the humor which remained as cloudy and opaque as on the preceding day. Again he dropped in the solution of dionin for the same purpose as before. The examination made the following day showed no improvement. Witness stated that there was nothing abnormal in the appearance of plaintiff's face, no swelling of the face, eye or eye region, and no change in the condition of the eye. Under the dictation of the witness the clerk, Miss McAllen, entered the history of the case in the big book, and this record, which is in evidence, agrees

with his testimony as to the history, diagnosis and treatment of the eye.

Witness denies telling plaintiff that the reflexes of her eye were good and states that he did not hear Miss McAllen make any such assertion as that attributed to her by the deputy sheriff. Miss McAllen contradicted the deputy in her testimony. Dr. Tiffany testified that when plaintiff and her sister called upon him "Dr. Howard and the office girl gave me a little history of the case and brought the book to me and showed me the data they had in the book, which embraced her history, age, vocation and so on, also the vision of the right eye and the blindness of the left," that plaintiff heard these recitals and did not dissent and that he took her into the dark room and examined her eyes with the ophthalmoscope. He found the right eye "very highly myopic" and as to the left eye, he states, "I could not see the fundus or back part because of this opacity of the vitreous, a very dense opacity, which would not permit it to illuminate the back part of the eye." He said to Dr. Howard, in the presence of the Misses Coffey, that there was no reflex in the left eye, and Dr. Howard replied, "that is what the book shows," without evoking any dissent from plaintiff or her sister. Witness further testified to the absence of any swelling in the face or other abnormal appearance. He did not deny that he charged the women with "looking for trouble," nor that he ordered them to leave his office.

The expert witnesses introduced by defendants agree that a one per cent solution of atropine sulphate is harmless and is generally used by specialists to dilate the pupil when it is desired to project light into the posterior of a diseased eye and that aside from occasionally producing a temporary swelling of the conjunctiva the dropping of an eight per cent solution of dionin into the eye is harmless and is done by ocu-

lists to clear up opacity in the vitreous humor by increasing the lymphatic circulation and thereby drawing off the foreign and deleterious infusion. One of the experts, on cross-examination, suggested that some persons have a peculiar idiosyncracy to atropine poison but the opinion evidence as a whole strongly tends to show that both of the solutions are perfectly harmless and will not produce the condition of the eye and face plaintiff claims followed the last treatment given on her second visit. Inasmuch as she suffered no ill effects from the first day's treatment which Dr. Howard states consisted of the application of atropine sulphate, it is fair to assume that she was free from the idiosyncratic trait just mentioned and the conclusion is irresistible that her eye was not poisoned either by atropine sulphate or by dionin. The real issue contested at the trial was whether or not her evidence tends to show that Dr. Howard by mistake and with negligence dropped a poisonous and destructive drug into her left eye on the occasion of her second visit to his office.

This issue was submitted to the jury and resolved in favor of plaintiff and a verdict for damages in the sum of $10,000, was returned against both defendants. Plaintiff filed a remittitur and all accrued interest and judgment was rendered for her in the sum of $7500. Both defendants appealed and their principal contention is that the court erred in overruling their demurrers to the evidence. Since the evidence relating to the conversation in the presence of the deputy sheriff was admitted against only one of the defendants we shall postpone our inquiry into its admissibility until after the disposition of the questions presented by the demurrers and in the consideration of those questions we shall regard the record as containing no direct evidence that iodine was put into the eye of plaintiff by mistake.

Plaintiff relies upon circumstantial evidence to take her case to the jury and our first task is to ascertain and pronounce the rules of law which define the liability of physicians for injurious errors in practice and which control the analysis of circumstantial evidence where such evidence alone is relied upon to support an actionable charge of malpractice.

The petition alleges that the injury "was directly caused and occasioned by the careless, negligent and unskillful acts of the defendants and the failure of said defendants to exercise ordinary care and skill in the treatment of plaintiff."

There is no suggestion in the evidence that defendants, or either of them were incompetent or unskillful. On the contrary they appear in the record as oculists of the highest attainments in their profession and the case presents no issue of an error of judgment, either in diagnosis or treatment, but turns on the question of whether or not a competent, experienced and skillful oculist inadvertently and negligently used a virulent poison when he intended to use a harmless drug.

The gist of the action being negligence, the burden is on plaintiff to establish by proof, first, that a negligent error was made by Dr. Howard in the treatment of her eye, and, second, that such negligence was the direct cause of her injury. [Spain v. Burch, 169 Mo. App. 94.] A physician or surgeon is not an insurer that he will effect a cure, nor that his diagnosis or treatment of the case will be free from honest errors of judgment. He is not required to come up to the highest standard of skill known to the profession and when he accepts employment is bound only to exercise such reasonable care and skill as usually is exercised by physicians and surgeons in good standing. [Martin v. Courtney, 75 Minn. 255.]

"A physician entitled to practice his profession, possessing the requisite qualifications, and applying his skill and judgment with due care, is not ordinarily liable for damages consequent upon an honest mistake or an error of judgment in making a diagnosis, in prescribing treatment, or in determining upon an operation, where there is reasonable doubt as to the nature of the physical conditions involved or as to what should have been done, in accordance with recognized authority and good current practice." [Staloch v. Holm, 100 Minn. 276.] In that case the court properly recognized the distinction between matters of science and those of art. As to the former, an honest error of a legally qualified physician or surgeon cannot afford a cause of action, no matter how injurious it may be to the patient, while in matters of art, i. e., in the performance of surgery, or in the application of remedies, his negligent errors are held to be governed by the ordinary rules of negligence. Thus a physician should not be held liable for erroneously, but honestly, deciding to perform a surgical operation upon a patient, for that would be an error in a matter of science and the law would be too harsh and severe should practitioners of medicine or surgery be held to know at their peril what were best to be done in a given case. But a surgeon who uses an unclean or rusty knife in an operation, or a physician who administers a dose of medicine without knowing what it is, would be guilty of failing to exercise reasonable care, since an ordinarily careful surgeon or physician would not use an unclean knife, or administer a medicine without knowing what it is. Plaintiff contends that her evidence accuses Dr. Howard not of a wrong diagnosis or of an erroneous selection of an improper solution to drop into her eye, but of negligence in using a solution without discovering, as he should have

done, that it was not the one he intended to use but was a poison he would not have thought of using.

The answer of defendants to this contention is that there is no proof that he dropped anything into her eye but a one per cent solution of atropine sulphate and an eight per cent solution of dionin and that plaintiff's conclusion to the contrary rests entirely upon conjecture and speculation. We agree with counsel for defendants that mere proof of a failure to cure, or that a bad result appeared to follow the physician's treatment, of itself, would raise no presumption of absence of proper skill and attention, or of negligence in giving the treatment. We exclaim with Thayer, J., in Haire v. Reese, 7 Phila. 292: "God forbid that the law should apply any rule so rigorous and unjust as that to the relations and responsibilities arising out of this noble and humane profession," and agree with Taft, J., in Ewing v. Goode, 78 Fed. 442, that "if a failure to cure were held evidence, however slight, of negligence on the part of the physician or surgeon causing the bad result, few would be courageous enough to practice the healing art; for they would have to assume financial liability for nearly all the 'ills that flesh is heir to.'"

The practice of healing, throughout the ages, has been esteemed one of the noblest and most useful of human activities. It is to the interest of mankind that it should engage the attention of men of the highest ability, skill and devotion to the conservation and development of the race and the law will not array itself against this manifest interest by allowing the stamp of guilt or recreancy to be placed upon an honest failure to cure, since every physician, no matter how careful and skillful he may be, must fail in many cases, to benefit his patients.

But as we view the evidence of plaintiff, her cause does not rest upon mere proof of a bad result follow-

ing a treatment selected in good faith and properly applied by a physician of recognized skill and ability. The facts and circumstances adduced by her cannot be harmonized with the assertion of Dr. Howard that he dropped nothing into her eye but harmless solutions of atropine sulphate and dionin, and show beyond question that something 'was put into her eye, on the occasion of her second visit which poisoned it and put out its sight. Her evidence that her eyes were not seriously impaired or affected when she visited him is reasonable, as is also the evidence that her eye and face became swollen and inflamed immediately after the treatment in question. In the consideration of the demurrers to the evidence, we must accept these as proved facts, despite the contradictory evidence of defendants that she was blind in the left eye when first she consulted them. As a whole, the evidence will support the hypothesis that plaintiff went to defendants' office with a comparatively well eye, received a treatment that immediately put out its sight and that the application to her eye of a one per cent solution of atropine sulphate or of an eight per cent solution of dionin could not and would not have produced such an injury. Under such hypothesis, which is well supported by reasonable and credible evidence, the inference follows, not as one built upon other inferences or conclusions, but as one forced by its evidentiary elements, that Dr. Howard, despite his assertion to the contrary, put some other liquid into her eye than that he thought he was using. Of course he did this unintentionally and in the mistaken belief that he was using the proper solution, but such a mistake cannot be considered in any other light, under the rules we have discussed, than as one not of science, but as the result of a lack of reasonable care, and, therefore, one for which an action will lie in favor of the injured patient. It is similar in character and legal effect to the negli-

gence of a surgeon in using an unclean knife or saw in an operation or in sewing up a sponge in an abdomen operated upon, or of a physician in giving a dose of medicine to a patient out of the wrong bottle.

It did not devolve on plaintiff to prove the kind of poison defendant put in her eye. Her evidence, showing beyond question that she was poisoned, is sufficient to make a case to go to the jury. Nor did her burden of proof require the introduction of expert evidence to support her charge of negligent poisoning. There may be instances where expert evidence should be treated as more than advisory, but in malpractice cases such exceptional weight is found to be accorded to opinion evidence only in cases where the issue is the alleged incompetency or unskillfulness of the physican and has no place in a case, such as the present, where the alleged negligent act of a competent physician is of a nature to be readily understood by men of common knowledge and understanding.

In answer to the argument that the evidence leaves the cause of plaintiff's injury in the field of debate and conjecture, since the blindness of the eye may have been caused by malignant myopia, we say that this argument rests alone on defendant's evidence. The evidence of plaintiff, which is credible and substantial, describes a condition of her eye that will not admit of the theory that she had malignant myopia or was afflicted with inflammation of the posterior parts of the eye or with any breaking down or impairment of the vitreous humor. The evidence of plaintiff presents no alternative hypothesis of the cause of the injury but points to the pleaded negligence as the sole cause.

The argument against the admissibility of evidence relating to the conversation at the office of defendants in the presence of the deputy sheriff is based on the view that the maxim *qui tacit consentire videtur*

(he who is silent is understood to consent) should be applied with the utmost caution and that the occasion in question did not imperatively require of Dr. Howard the denial of his clerk's assertion that he had put out plaintiff's eye with iodine. "Speaking of the maxim, it is said in Greenleaf on Evidence (16 Ed.), sec. 198, " 'It should always be received with caution; and never ought to be received at all, unless the evidence is of direct declarations of that kind which naturally calls for contradiction;.some assertion made to the party with respect to his right, which, by his silence, he acquiesces in.' A distinction has accordingly been taken between declarations made by a party interested and a stranger; and it has been held that, while what one party declares to the other, without contradiction, is admissible evidence, what is said by a third person may not be so. It may be impertinent, and best rebuked by silence."

In State v. Hamilton, 55 Mo. 520, it is said that "unless it is shown that the party is immediately concerned, and that unless he did speak, his silence might fairly be construed into an admission, the declarations will not be admissible." In Banks v. Nichols, 43 Mo. App. 385, such tacit admissions are made to depend on the facts, first, of whether the party accused understands the accusation and comprehends its "hearing and, second, "whether the truth of the facts embraced in the statement is within his own knowledge or not; whether he is in such a situation that he is at liberty to make a reply; and whether the statement is made under such circumstances and by such persons as naturally to call for a reply, if he did not intend to admit it."

If the accusation had been made in the presence of plaintiff or her agent, there could be no question but that the failure of defendant to deny it would bring the charge and his silence within the rule of the

maxim, but the officer was not the agent of plaintiff, and had nothing to do with the judicial inquiry into the cause and, therefore, a closer and more difficult question is presented. Had the charge come from an impertinent stranger, no admission of its truth could be implied from the silence of the accused. It did not come as an impertinence but in answer to a question asked by the accused of the young woman who was a sort of factotum in the office of defendants, received their patients, inquired into their business and kept the office record of cases treated by defendants. The question asked by Dr. Howard called for information kept by her in the course of her employment for the benefit and future use of her employers, and her answer was in direct response to that question. It purported to give him the facts relating to the history of the case as she had received them from him, and it would have been most unnatural for him not to deny such a charge if it were false, no matter who was present. It was just as though she had said: "You told me you put out the woman's eye and that is the history of the case in this office." A charge of that kind, if false, would bring a denial from any man under any circumstances. The evidence was properly admitted.

We have examined carefully into the objections made by defendants to portions of the arguments of counsel for plaintiff to the jury and have come to the conclusion that the arguments did not transcend the bounds of propriety. There is no prejudicial error in the record.

Affirmed. All concur.