MAY SNYDER, RESPONDENT, v. ST. LOUIS SOUTHWESTERN RAILWAY COMPANY, APPELLANT.—72 S. W. (2d) 504.

Springfield Court of Appeals.   June 18, 1934.

*Langdon R. Jones* and *Orville Zimmerman* for appellant. lant.

*T. R. R. Ely, Bradley & Bradley* and *Tom Ely* for respondent.

BAILEY, J.—This is a suit by an only surviving parent to recover damages for the death of her infant daughter, based upon the alleged failure of defendant to provide transportation and hospital service for said child. The petition states that defendant railroad runs through the town of Malden in Dunklin County; that when the cause was originally filed plaintiff's husband, Otto Snyder, was a party plaintiff, but that her husband has since died and that plaintiff is the surviving parent; that Fannie Snyder, at the time of her death, was two years of age, and a dependent member of the family of plaintiff and her said husband; that Otto Snyder, the father of Fannie, was, on the 26th day of March, 1930, and for a long time prior thereto had been, an employee of defendant railroad company working as a member of the section crew out of Malden, Missouri; that, under the rules of defendant, its employees were required to pay defendant a certain portion of their monthly wages for hospital purposes, which deductions were regularly made from the wages of said Otto Snyder; that by reason thereof defendant was obligated to extend hospital services and medical attention to said Otto Snyder and to furnish surgical treatment when necessary to members of the family of said Otto Snyder; that defendant had in its employ one Dr. Homer Beall, as district surgeon at Malden, whose duty it was to provide for surgical treatment for dependent members of the employees of defendant railroad; that about March 28, 1930, while Otto Snyder was an employee and paying his dues, as aforesaid, Fannie Snyder, his infant daughter, become stricken with a disease or infection known as "noma;" that plaintiff immediately called said Dr. Beall, defendant's district physician, and that Dr. Beall undertook to diagnose the affliction of Fannie Snyder in consideration of the duty defendant owed its employees as aforesaid; that plaintiff and her husband Otto Snyder relied upon defendant through its said district surgeon to diagnose the ailment of Fannie Snyder and determine if surgical treatment was necessary; that defendant, through its agent and servant Dr. Beall, failed to exercise ordinary care in making the diagnosis of the disease with which Fannie Snyder was suffering and neglected, failed and refused to send the said Fannie Snyder to the hospital for surgical treatment, so that, because of such negligence, the said Fannie Snyder died on the 23rd day of December, 1930.

It is further alleged that the station agent at Malden refused transportation to send the child Fannie Snyder to a hospital upon the refusal of Dr. Beall to approve the issuance of such transportation; that because of the negligent acts of defendant there was a delay in getting Fannie Snyder to a hospital and plaintiff and her husband were compelled to send her to a private hospital where she died, as aforesaid, because of said acts of negligence on the part of defendant's

said agents. Judgment was asked in the sum of $10,000. On trial to a jury the issues were found for plaintiff and the jury returned a verdict in the sum of $1000. From the judgment entered thereon defendant has appealed.

Error is assigned first because the trial court overruled defendant's demurrer to the petition. This point was abandoned by the subsequent filing of an answer on the part of defendant. [Binswanger v. Employers, etc., Corporation, 224 Mo. App. 1025, 28 S. W. (2d) 448.] We are of the opinion, however, that the petition is good, particularly after verdict. It has been held that an association or trust, such as we have in this case, though having a separate charter, is the *alter ego* of the railroad company, or at least its agent, and that the railroad company is liable for the negligence of said association or trust. [Phillips v. Railroad, 211 Mo. 419.] After the demurrer was overruled, defendant filed an answer consisting of a general denial; and it was further pleaded that Dr. Beall was not in its employ on the dates alleged in the petition; that defendant owed no duty to plaintiff or her daughter Fannie Snyder, because Otto Snyder was, on the dates alleged, an employee of defendant as a section workman; that Dr. Beall was an employee of the staff of a hospital trust of which defendant is trustee without compensation; that under the terms of said trust agreement defendant as trustee and as a railroad corporation is not responsible for the negligence of any employee thereof.

It is trenuously urged that the demurrer to the evidence offered at the close of the whole cause should have been sustained. This requires a review of the evidence and in passing on the demurrer this court will follow the well-settled rule that plaintiff's evidence is to be accepted as true and she is entitled to the benefit of all evidence in her favor together with such inferences as may reasonably be drawn therefrom. [Clower v. Fidelity-Phoenix Fire Ins. Co., 296 S. W. 257, 220 Mo. App. 1112.]

At the time of the trial Otto Snyder was dead, but his deposition was offered and read to the jury. He testified that he was the father of Fannie Snyder; that she took sick on the 28th day of March, 1930; that he was employed by the Cotton Belt (which is defendant railroad); that he belonged to the hospital association and paid his dues; that on the 28th day of March, Dr. Beall was the railroad physician at Malden; that Fannie was a little over two years old; that he called Dr. Beall on March 28th; that he came to see the little girl twice and that he took her three times to Dr. Beall's office; that she was home from the 28th day of March to the 12th day of April, (1930). He further testified as follows:

"I went down after Dr. Beall; he shook his head, said he didn't see as he could do any more for that child, and I went back and got Dr.

Van Cleve; he come down and said the only thing to do any good in the world would be an operation to cut that out, and I went back to Dr. Beall and he told me to get ready and he would send her that night to the hospital, and when night come I met Mr. Stroup at the carhouse; Mr. Stroup met me and he said 'Now, I haven't got my book here' but he says 'I'll be up there at 8 o'clock,' and he was, and I think he missed it about two minutes; and when I went in, why Mr. Beall set there with his head down—He set there with his head down and said 'I've sent them down there and they send them back, therefore I won't send her down there, for they have given orders—I don't know why.' He said he wouldn't send her down because it would give him a black eye. After he refused to send her to the hospital I went back to Dr. Van Cleve. I did not get her into the hospital until the 12th of April, and my wife and I went with her. She stayed in the hospital about three weeks. Old Dr. Bartlett and Dr. Weber waited on her. They operated on her three times—I'm going to be honest and frank with the world—they didn't cut much at the time for they couldn't, she was so sick; they had to use my blood to build her up; they gave her five transfusions of my blood. Dave Bagby furnished me my transportation to the hospital.''

He further testified that he personally paid Dr. Beall for one of the calls but not for the others, but intended to do so.

Mrs. Snyder, the plaintiff, testified that Fannie took sick on the 26th of March but that Dr. Beall did not come to see the child until the 28th; that in the meantime they called a Doctor Mitchell, who pronounced her trouble as "flu" and a little sore throat; that when Dr. Beall came he, "looked at the baby he said, 'Well, I am certain that will have to be removed.' He said it was an abscess of the gland and the quicker we could poultice that and bring it to a head the better it would be for the baby. And that is what I did. He told us to get antiphlogestine and keep a plaster on her face and that is what we done. Dr. Beall didn't stay very long. He refused to return to see the baby. I went with our baby to his office, on Wednesday after the 28th of the month. He didn't say what was the matter with the baby at that time. He taken a solution and fixed some cotton on a swab stick and mopped out her throat; just mopped out a mouthful of corruption with a bad odor. That infection was on the inside of the mouth and on the outside too before it was over with; of course the jaw swelled up but the corruption and blood came from the inside first. We taken the baby five times to the office but of course I didn't make all the trips myself.

''The doctor told us to swab her throat every three hours; I taken her on Wednesday, and on Thursday morning to see if we were getting along all right in cleaning that out, and he didn't mop her throat

out that morning at all but of course he gave a solution for us to use in her mouth.''

She further testified that afterwards, on April 12th, they took the child to the Baptist Hospital in St. Louis and she stayed there with the child until April 28th; that on the day they arrived in St. Louis the doctors at the hospital either, ''burned it out or cut it out; they had done away with the rotten flesh.'' She returned home to Malden and thereafter went back to St. Louis on May 19th. At that time, she testified, that the face of the child had healed considerably and better than she had thought it would be. Plaintiff saw her child no more until after its death, which occurred December 23, 1930.

Dr. John Van Cleve, who was called to examine the child after Dr. Beall had decided he could do no more, lived at Malden and was a regular practicing physician. It is upon his testimony plaintiff largely bases her case. He testified in part as follows:

''I recall treating or seeing Fannie Snyder, the daughter of Otto Snyder, about noon time on April 12, 1930. I saw the baby at the home of Mr. Snyder. At that time the child was in an unconscious state with considerable temperature. A small opening probably as big as your finger with a dark necrotic mass around it as big as a nickel with considerable odor. If I remember correctly it was on the left side about this point (indicating), just underneath the jaw bone; I would say about an inch and a half to the left of the point of the chin, just beneath the inferior maxillary bone. My diagnosis of the disease the child had at that time was noma. Noma is a gangrenous condition, a rapid sloughing condition of the tissue. Gangrenous condition is a decaying and sloughing condition of the tissue of considerable odor.

''From the child's condition and the progress of the disease up to the time I saw it and the history I ascertained that existed, I would say the child had been so affected ten days or more. It is my opinion that treatment for noma can be divided into two; medical or surgical. A medical treatment can be used for probably the first four or five days with a certain amount of success. After four or five days usually the mitosis or gangrene has progressed until medical treatment is no good and cauterization or removing of the affected tissue with a knife is proper treatment and might be termed surgical. My opinion of the child, the condition I saw it in on April 12, 1930, it was beyond any medical aid; I mean the only treatment remaining was surgical or cauterization, the burning out of the affected tissue with hot iron or nitric acid. Cauterization and surgical treatment is synonymous with that treatment, I would consider that surgical. Noma will spread from within out and eat out tissue. It just sloughs and falls away,

and it will produce a certain amount of poison that is absorbed and taken up in the system that causes symptoms.''

According to the death certificate the child died of measles with contributing causes of ''Lateral Sinus Thrombosis'' and also an operation for ''Mastoiditis.'' Dr. Van Cleve defined Lateral Sinus Thrombosis as a piece of foreign matter which occludes the large blood vessel in brain and keeps the circulation from the brain. He further testified that ''thrombosis could be due to noma.'' After repeated attempts on the part of counsel to show by this witness a connection between the death of the child caused by measles and the noma infection, the witness testified, over the strenuous objections of defendant, that, ''An unhealed noma might leave a condition that would cause complications of the measles that might cause death.'' He further testified, over defendant's objection when asked as to what the thrombosis likely came from in this case, that, ''It is my opinion it was probably a piece of necrotic tissue from the unhealed noma and it could have come from the mastoid condition that is alleged to have happened.'' On cross-examination he testified as follows: ''If death is going to result from the noma, in an untreated case it might be from seventy-two to well, 100 hours, something like that. If the case is treated—if the patient is not going to recover, the patient usually lives just a few days after it takes the disease. I would say that the general average would be five to ten days.

''I saw this child on April 12th. Noma might have existed eleven or twelve days at that time; it could be ten, it was more than five; that would be my opinion; more than five but I don't know how long. Noma is also known by another name, gangrenous stomatitis; it is the same thing. There is another disease known to children called ulcerative stomatitis; that is not ordinarily serious. Ulcerative stomatitis could develop into gangrenous stomatitis; not quite a few do develop that way, because you have just stated it is a rare condition; some of them do. I couldn't say how long I think the child would live after April 12th when I saw it if it didn't recover and respond to treatment for the noma; I don't know; I don't think it would live very long unless something was done. The condition I saw the child on April 12th, without treatment, I don't think it would live over two or three days. The child couldn't have lived until December in the state I saw it on April 12th. I think it made very good recovery so far as life is concerned. If the child lived until December I would say in my opinion, in the condition it was in it had made a pretty good recovery from the noma. ———— The sinus is a blood vessel near the ear, between the ear and the brain; it is almost straight in from the ear; it is just a large blood vessel; the blood flows through there and nourishes the brain. Thrombosis is any foreign body that

gets into the blood vessel and prevents the circulation of blood to nourish some portion of the brain. That foreign matter might get in there from many causes; at least a dozen things might cause this lateral sinus thrombosis. Noma is just one of a dozen things that might contribute that foreign matter in the sinus. Primarily, measles is not one of the things that may cause that obstruction; it could come from complications which follow measles. The purpose of an operation for mastoiditis is to drain pus out of the mastoid cells. The mastoid cell is located right back of the ear in this bony structure. The inner surface of the bone lies very close to the lateral sinus, almost in contact. Pus in the mastoid cell is a rather common complication of the measles. An operation for mastoiditis would be another one of the causes of an obstruction in the lateral sinus; that is one of the natural causes.''

On re-direct examination, over defendant's objection, he further testified that, ''when a case has got far enough for surgery it is a pretty desperate case and the chances are none too good to get well from surgery, but that is the only hope.''

Then the following occurred: ''Judge BRADLEY: If it had been given surgical treatment timely what would have been its chance of recovery from noma, such as a doctor with ordinary skill and experience would have prescribed?

''MR. JONES: We object to that for the same reasons heretofore assigned and for the additional reason that it is already shown that this doctor doesn't know when this noma developed and for the further reason that there is no testimony that Dr. Beall saw the patient after it developed this noma.

''THE COURT: Overruled.

''MR. JONES: We except.

''A. The sooner it was operated on the better its chances. The longer it was put off the less its chances.''

He further testified (questions and answer) as follows:

''How long in your opinion, had this baby needed surgical attention when you first saw it?

''MR. JONES: We object to that for the reason that this witness has already testified that the ravages of this disease were varied and you couldn't tell by the inspection when the disease first started and if that is true, under his testimony there is no foundation for qualification for this question and he couldn't be certain whether he had it more or less than five days.

''JUDGE BRADLEY: But I want to be certain about how long he says it needed surgical attention.

''THE COURT: If he has an opinion he may answer.

''MR. JONES: We except.

"A. I would say at least possibly two days before I saw it.

"Judge Bradley: And I believe you stated on direct examination that this disease had been apparent for five days or more?

"A. Yes, sir."

On re-cross examination he testified that: "Possibly from the time I saw her on April 12th it had needed surgical treatment just from about April 10th, two days before; that is possibly right, I probably stated a while ago that the disease of noma was varied in its ravages and you couldn't tell from one inspection when the girl was first stricken with it, yes sir. I haven't changed my mind; I think it was five or more days that it had had the condition and the surgical condition was probably one or two days before. I couldn't say if it could have been discovered prior to April 10th. The surgical situation might have been, but that is my opinion; at least that long, two days."

There was further evidence on the part of plaintiff that Dr. Beall had said that he did not believe it to be an operative case and that therefore he could not send the child away to the railroad hospital.

The rules of the Hospital Trust were introduced in evidence, which, so far as relevant to the issues, were as follows:

"2.6 Dependents. *Bona fide* members of the immediate family and household of employees wholly dependent upon such employees will be entitled to surgical treatment only upon the conditions of and in accordance with rules 4.2, 6.3, 6.4 and 6.5 hereof.

"3.1 Order for Treatment. Beneficiaries not holding annual passes over one of the Railways desiring treatment will obtain order therefor from any officer of company of or above the grade of Foreman, Yardmaster or Roadmaster under whom they are employed, or in emergencies any other such officer or station agent who can certify to their employment.

"3.3 Transportation. Any agent of the Railways will arrange free transportation over the Railways to or from a hospital or emergency station for beneficiaries desiring treatment upon presentation of an order for treatment and proper identification of the bearer.

"4.2 Dependents. Dependents are entitled to surgical treatment only, and only at the Texarkana and St. Louis hospitals. [See 6.2 and 6.3.]"

It will be recalled that Fannie took sick on March 26th. The first physician to attend her was Dr. Mitchell. He diagnosed the case as one of influenza and sore throat but was not called after the 28th of March. He testified on behalf of defendant that he visited the Baptist Hospital in St. Louis on August 30, 1930, saw the child and at that time, "it was over the grade as to the disease called noma." He also testified that mastoiditis was a very probable result from measles; that the mortality rate from noma was about seventy-five or eighty per

cent; that the child did not need an operation; that an operation would have killed it.

Dr. Homer Beall, district physician and surgeon for St. Louis Southwestern Railway Hospital Trust, testified he was called to treat the child, daughter of Otto Snyder as a physician, as he recalled, on March 29th; that it was private practice for which Mr. Snyder paid him $2.50; that on the occasion of his first visit the child had an infection of its throat and that the glands were swollen under the jaws; that he prescribed for the child on that occasion; that he saw the child the next day and the infection of the throat seemed more violent; that he made an examination and saw no ulceration condition of the child's mouth; that he made three home visits and the condition of the child was not improved; that as he remembered they brought the child to his office about the fourth day from the first visit; that he gave antiseptics for treating the swelling inside, hoping to destroy the germs; that at that time he did not discover any symptoms of noma; that the mother brought the child to his office once and the father two or three days; that the inflammatory condition of the throat and mouth was progressive from the beginning and gradually grew worse; that he saw the child the last time two or three days before it was taken to the hospital which was about April 12th; that the last time he saw the child was the first time there was an appearance of noma; that he continued the treatment he had been giving; that he told the father the child had a very grave disease; that he had had one previous case; that that case died in short order and that he could give the father no hope; that it was a very rare disease and he told the father the child should be hospitalized; that it was not a case for surgery when he discovered the disease.

On cross-examination Dr. Beall testified as follows: "I knew Mr. Snyder was an employee of the Cotton Belt, and I suppose I knew when I first called to see the baby. Mr. Snyder did try to get me to O. K. a pass for him and his baby to the Cotton Belt hospital in the presence of Mr. Stroup the night he went to St. Louis, and I declined to do that; I couldn't; I declined because it didn't come under the rule admitting dependents in the hospital. That rule is that they receive surgical treatment only. I did not think that surgical treatment might have helped that baby. Surgical treatment is one of the prescribed treatments for noma; you can find all sorts of prescriptions for everything; I knew that when I refused to give her father an O. K. for the pass. The disease had developed to the extent that I didn't feel that I could do any more. As the hospital operates it wouldn't come under the head of major surgery. It would be minor surgery. . . . . .

"(Witness continuing): The rules say surgery; I don't know that it

says major surgery but you wouldn't go there to have an abscess opened. There is quite a distinction between major and minor surgery. The housewife or anybody does minor surgery most any time. They will pick an abscess or tie up a finger and that is minor surgery but nobody opens up an appendix or does a mastoid operation or takes out tonsils. If the gangrenous area in this baby's mouth was removed by a knife that would be foolish surgery, that is just my opinion; if that were done it would be minor surgery. A little more major than opening an abscess but it would be just like cutting a hole out of a blanket; minor surgery. I don't know how long this baby would have lived, knowing the stage of development of the disease, under the treatment I was administering; judging by my limited experience and what the books say about it, it would probably have lived from one to six or seven days, something like that.''

He was then asked a question and answered as follows: ''Q. Now, Doctor, if you knew on April 11, 1930, that surgery was one of the prescribed treatments for noma and knew then that this baby had noma and knew that its father was an employee of the Cotton Belt Railroad, why didn't you O. K. a pass to send that baby to a Cotton Belt Hospital?......................

''A. If the child should survive the treatment would be long and drawn out. It would not take the services of a skilled surgeon to treat the child. It needed the services of a skilled interne or medical man. The hospital of the defendant railroad company is pretty well equipped, yes. I don't know positively but I assume that anything that the baby could have received at the Missouri Baptist Hospital could have been received at the Cotton Belt Hospital. So far as I know they have skillful service and all of the equipment that is considered necessary for a well equipped hospital, both at Texarkana and at St. Louis. About the only noticeable difference in the appearance of that baby's mouth and face on the day I discovered the noma and the last previous day I had seen it to a casual observer would be the dark spot or the gangrenous spot, the spot of dead tissue in the child's jaw. The glands were still swollen in the mouth and this would be the only thing noticeable. You would notice, too, that the child was visibly not so well; it would be depressed and its heart would increase in rapidity; temperature depending on its resistance would be either up or down and the child perhaps bedewed with a sticky, clammy sweat due to the poison of the noma plus the infection it had in its throat. When I knew that baby had noma two or three days before it was sent away, I did not tell the father and mother it needed to be operated; I just said hospitalization and did not tell them what I meant by that. My meaning in that particular

case was to place the child in a hospital for its proper treatment and nourishment.''

Dr. Willard Bartlett, Jr., who treated the child while she was in Missouri Baptist Hospital at St. Louis, testified in part as follows: ''I had occasion to see and treat a patient, a little girl named Fannie Snyder, who was about two years old. She became a patient of mine April 13, 1930, and at the time I was called to treat her she was suffering from gangrene of the mouth and left check; the technical name is noma. I made an examination of her at that time, and diagnosed that to be the disease known as noma. She remained my patient and under my care from April 13th to December 9, 1930. The treatments I administered were blood transfusions, repeatedly; sulpharsphenamine, intramuscularly; that is a medicine, a preparation of arsenic, administered into the muscles, by hypodermic injection. She also had local treatment, consisting of glycerine packs, mouth wash of potassium chlorate, as well as packs of the latter; I believe that is all. Whether the treatment I have just detailed would be called medical or hospital treatment, or surgical, is purely a matter of definition. Off-hand, I do not call administering any medicine or anything of that kind hypodermically surgery. Technically, the treatment I administered, which I have detailed, is what I would call hospital treatment, medical treatment, rather than pure surgery. This treatment caused a very marked gradual improvement in the condition. The condition in which I found her required several months or a long time of treatment, and at the time she passed out of my care she was not completely cured. She was very materially improved, so far as the condition of her gangrene of her noma was concerned; she was sent to the St. Louis Isolation Hospital for the care of her measles, as she had contracted measles. During the time she was under my care she was at the Missouri Baptist Hospital, but not exclusively; she was out of the hospital on several occasions, with relatives, with Mrs. Myrtle Bartram, I presume the child's aunt. She lives in St. Louis or one of the suburbs. I have a note here from her parents asking us to let Mrs. Myrtle Bartram takes the child out for rides, she did not specify for rides, she says when she wants her. I don't know whether she went to her home; she took the child out of the hospital and brought her back. The child was not out over night at any time, I believe. I don't know if the measles was contracted while the child was out with its aunt, or contracted in the hospital; the child developed a case of measles about the 9th of December; she developed a rash and felt sick on the 8th of December, and left the hospital on the 9th. ............From my experience and observation and from my teaching and training in my profession, I considered, and it was my opinion, that this was a case for treatment and nursing, and the administering of treatment hypodermically and locally, with medi-

cines and drugs, foods, liquids, instead of a case for immediate surgical treatment. She was on the road to recovery when she was removed to the Isolation Hospital. It was my opinion as a physician and surgeon that she would recover from the noma, aside from any intervening cause or other disease. The bleeding had stopped long before she left the hospital but there was an occasional discharge of small amounts of pus. The discharge was greatly lessened in amount, and only occasional in occurrence. The child had gained weight and she was in better condition generally.''

On cross-examination he further testified: "It is my judgment that this disease affected the child about two or three weeks before it was brought to the hospital, no longer than that; that is my judgment about that, from my inspection of it. At the time it was brought here the left check principally was affected, back to just behind the angle of the jaw. At that time it was a highly dangerous disease. Sometimes they do operate for that disease. Surgical opinion is divided as to whether they ought ever be operated on, and one can only operate on a patient who is in reasonably good general condition to withstand an operation.''

On re-direct examination he said: 'When this child was brought to the hospital here it was placed in my charge for treatment. I did not perform an operation on this child. The child was too sick on entrance to stand much operating, so severe a procedure as plunging a cautery into its face. Under local treatment and the other treatment outlined it began to improve and naturally we assumed that it would continue to do so, without an operation.''

On recross examination he stated: "This disease progresses at such different rates of speed in different individuals that I do not believe one can generalize about how long after it starts you can detect that it is this trouble. Yes, there are certain indications that this sort of disease is working on the child, sometime. You can recognize it by certain signs, perhaps, but their time of appearance varies a good deal. The name noma is given where one recognizes a rapidly spreading destructive ulcer which has a tendency to go through the cheek.''

There was other evidence to the effect that the child died in December, 1930, the next day after a mastoid operation following the measles.

We have quoted rather fully from the medical testimony in this case for the reason that the question involved is independent almost entirely upon such class of evidence. Without going into an extended review of this evidence we find under the evidence of plaintiff's witness Dr. Van Cleve, that the child, Fannie Snyder, when examined by him on the 12th day of April at about noon, was suffering from a pronounced case of noma, a gangrenous condition of the mouth and

a most dangerous but rare disease. We further find from his testimony that in the condition he found the child, noma should have been capable of discovery upon examination within one or two days prior to the time he examined her; that in his opinion the proper treatment of a child in that condition required either surgery or cauterization; that an unhealed noma might leave a condition that would cause complications of the measles that might cause death; that if the child lived until December, 1930, it had pretty well recovered from noma; that noma is one of many causes of obstruction in the lateral sinus following measles and a mastoid operation; and that a child in the condition he found her should be operated on as the only hope and the sooner the operation the better its chances.

On the other hand, other disinterested doctors testified that medical opinion was divided as to whether or not an operation was the best treatment; also the doctor who treated her in the Missouri Baptist Hospital testified that he did not operate, and that the child was recovering from the disease.

Dr. Beall testified that he discovered noma for the first time two days before the child was taken to the hospital. This is in harmony with the testimony of Dr. Van Cleve on that point.

We are of the opinion that under all this evidence the jury might reasonably have found that the child was suffering from noma at least two days before she was sent to St. Louis and there is no doubt that Dr. Beall, defendant's local physician, was then aware of the fact that she had that disease, for he so testified. The jury might further find from the evidence that it was a case requiring surgery in some form, although that was a mooted question. Even so, we fail to find in this whole record any substantial evidence showing a casual connection between the failure of Dr. Beall to properly diagnose the case in time, if he did, together with his refusal to grant permission for her to be sent to the railway hospital at the time he was requested to do so, and the subsequent death of the child in December. All the witnesses testified that the child was recovering from noma when she contracted measles. The reason for the complications following the case of measles in December is left to conjecture.

Dr. Van Cleve himself testified that any one of a dozen things might have caused the obstruction to the lateral sinus which evidently was the immediate cause of her death. Moreover, there is no evidence that if the child had been sent to a railroad hospital a day or two days before she did go to a hospital the result would have been different.

We are also of the opinion that defendant in this cause should be held only according to the rules of law applying to other cases of negligence and particularly those applying to cases of mal-practice

on the part of physicians and surgeons. Certainly defendant would be in no position to control the diagnosis of a physician nor to dictate his methods of treatment as would be true in the ordinary case of master and servant. [Haggerty v. Railroad, 100 Mo. App. 424, 74 S. W. 456.]

The law of negligence as applied to physicians and surgeons has been thus stated: ''The difficulty with plaintiff's case, as we see it, is a lack of evidence of any substantial character tending in law to show that plaintiff's injuries proximately resulted from defendant's negligence, if any, in failing, if he did, to sterilize his instruments immediately before using them. It is axiomatic in the law of negligence that a causal connection must be established between the injury or loss suffered and the negligence with which the defendant is charged. This need not be shown by direct and positive testimony; it is sufficient if it be made to appear by inference or inferences which may be reasonably and legitimately deduced from the facts and circumstances shown in evidence. But if the evidence, when viewed in the light most favorable to plaintiff giving him the benefit of all inferences which may be properly drawn in his favor, leaves the matter merely to speculation and conjecture, plaintiff's case must fail; for plaintiff carries the burden of adducing substantial evidence tending to affirmatively establish such causal connection. [See Battles v. Railways Co., 178 Mo. 1. c. 614, 615, and cases cited, 161 S. W. 614.] . . . . . . . . . . . When the entire evidence touching the matter is viewed it seems quite clear that the showing made is merely that plaintiff's injury was due to some one of several causes, for one of which only could the defendant be liable; and that which of these was the *causa causans* is a matter of pure conjecture. Under such circumstances the authorities agree that no recovery may be had.'' [Nevinger v. Haun, 197 Mo. App. 1. c. 427-428.]

In the case of McDonald v. Crider, 272 S. W. 980, it appeared that a woman had suffered a dislocation of the ulna which the physician in charge improperly diagnosed as a Colles fracture. In commenting on the facts the Appellate Court said: ''Defendant was required to use only that degree of knowledge and skill that physicians practicing in similar localities ordinarily possess. [Hill v. Jackson (Mo. App.), 265 S. W. 859; 3 Wharton's Med. Jurisprudence, 473.]

''Of course, defendant was liable if he failed to use that degree of care and skill of the ordinary physician of similar localities in diagnosing or discovering the true condition of plaintiff's arm. But there should be some testimony tending to show that a physician of ordinary skill in the locality in question, and by the means at hand could have discovered the dislocation or differentiated between it and a Colles fracture; or whether or not a physician of such skill should have

waited until the swelling subsided (if it would) before determining upon the character of the injury, or whether, if he was in the exercise of ordinary care in diagnosing the trouble as a Colles fracture under the circumstances, he should have made a further examination after the swelling had subsided." [l. c. 981-982.]

Here again is emphasized the necessity of causal connection.

We have found no better statement of the rule of care required of a physician than in the case of Bailey v. Railroad, 296 S. W. 477, cited by plaintiff, where this court, speaking through Judge Cox, said: "Physicians and surgeons must be allowed a wide range in the exercise of their judgment and discretion. The science of medicine is not an exact science. In many instances there can be no fixed rule by which to determine the duty of a physician, but he must often use his own best judgment and act accordingly. By reason of that fact the law will not hold a physician guilty of negligence as long as he uses his best judgment, even though his judgment may prove erroneous in a given case, unless it be shown that the course pursued was clearly against the course recognized as correct by the profession generally. As long as there is room for an honest difference of opinion among competent physicians, a physician who uses his own best judgment cannot be convicted of negligence, even though it may afterward develop that he was mistaken. [Van. Hooser v. Berghoff, 90 Mo. 487, 3 S. W. 72; Fausette v. Grim, 193 Mo. App. 585, 590, 186 S. W. 1177; Gottschall v. Geiger, 207 Mo. App. 89, 110, 231 S. W. 87.]" ..........l. c. 479.

To the same effect is Breeze v. Ry. (Mo. Sup.), 147 S. W. 409, and many cases. In Trask v. Dunnigan, 299 S. W. 116, involving an incorrect diagnosis, the court said: "Eliminating the assignment in the petition respecting the alleged negligent use of splints, there remains for consideration only the charge that defendant negligently and unskillfully diagnosed the nature and extent of plaintiff's injuries. So far as this issue is concerned, there is no doubt that there was substantial evidence that defendant did, in fact, make an incorrect diagnosis. Such fact, however, standing alone, would afford plaintiff no basis for the relief he asks, for the reason that the test of plaintiff's cause of action was negligence, and the burden rested upon him, not only to prove that defendant made a mistaken diagnosis, but that such mistake was a negligent one; that is, that defendant did not use reasonable care and diligence in the exercise of his professional skill, and in the application of his learning. [Gottschall v. Geiger, 207 Mo. App. 89, 231 S. W. 87; Nevinger v. Haun, 197 Mo. App. 416, 196 S. W. 39; Fausette v. Grim, 193 Mo. App. 585, 186 S. W. 1177; McDonald v. Crider (Mo. App.), 272 S. W. 980; Coffey v. Tiffany,

192 Mo. App. 455, 182 S. W. 495; Spain v. Burch, 169 Mo. App. 94, 154 S. W. 172.]"..........l. c. 117.

We find little, if any, substantial evidence in this case that Dr. Beall failed to exercise ordinary care in diagnosing or treating the case. He was a country doctor, but even in the experience of city doctors noma is said to be a very rare infection or disease. It is also a near fatal disease. Defendant was under no obligation, under the hospital rules, to treat the child of an employee but only to render service when such dependent reasonably required an operation; apparently no operation was performed in treating the noma; defendant was not responsible for the disease that attacked the child nor was it required to have it sent to a hospital unless requested, in any case. No request was made for hospitalization until about the very day the child was sent to the Baptist Hospital, and there is no proof that had it been sent to either Texarkana or St. Louis, to a railroad hospital, the child would have had any better care or would have recovered from the malady any sooner. There is no reasonable ground from the evidence to hold that the failure to send the child to a railroad hospital for an operation was a contributing cause to its death. This is left purely to conjecture. Some sort of complications following measles caused the death when the child was far on the road to recovery. Plaintiff may be able to supply what we consider a hiatus in the proof of her case but we are satisfied under this record that the demurrer to the evidence should have been sustained. Other assignments of error need not be considered at this time. The cause should be reversed and remanded. It is so ordered. *Allen, P. J.,* and *Smith, J.,* concur.